UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JEREMY J. SMITH,

Plaintiff

-vs-

THE VILLAGE OF BROCKPORT,
ZACHARY WAKEFIELD, CHRISTOPHER
CLAWSON and KELLY McCRACKEN, each
in his or her official and individual capacity,

Defendants

_____

DECISION AND ORDER

19-CV-6404 CJS

INTRODUCTION

In this action the Plaintiff asserts state-law claims for false arrest, false imprisonment, assault, battery, intentional and negligent infliction of emotional distress, and negligent hiring, retention and supervision, as well as a federal claim for constitutional violations of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983.  The claims arise from what Plaintiff maintains was an illegal seizure and search of his person during a narcotics investigation following a traffic stop of a vehicle in which he was a passenger.  Now before the Court is Defendants' motion for summary judgment, ECF No. 23.  The application is granted in part and denied in part, as follows: The application is denied insofar as it is directed at those portions of the First, Second, Third and Seventh Causes of Action that are based on the seizure of Plaintiff prior to the search; otherwise, the application is granted.

BACKGROUND

The following facts are taken from several sources including Defendants' Statement of Facts (ECF No. 23-1) and supporting exhibits, including the examination of Plaintiff pursuant to New York General Municipal Law § 50-h ("50-h hearing"); the depositions of defendant Brockport Police Officer Christopher Clawson ("Clawson") and defendant Brockport Police Officer Kelly McCracken ("McCracken"); the Defendants' body-worn camera footage; and the relevant police reports.  In that regard, when Defendants filed the subject motion, they submitted a statement of facts, to which Plaintiff did not submit a counter-statement of facts.  Accordingly, pursuant to the Local Rules of Civil Procedure, Defendants' statement of facts is deemed admitted, insofar as the facts set forth therein are truly undisputed.[1]  However, the Court does not accept as true any statements contained therein that are disputed by other evidence of record. *See, e.g., Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 656 (W.D.N.Y. 2017) ("This Court will deem the Plaintiffs' Statement of Facts admitted to the extent that it is supported by admissible evidence and to the extent that it is not contradicted by the admissible evidence of which this Court has notice through Defendants' motion papers.") (citations omitted); *see also, Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]e have previously indicated, and now hold, that while a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.").  With this understanding, the following are the facts of the case viewed in the light most-favorable to

---

[1] *See*, Local Rule of Civil Procedure 56(a)(1) ("Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.").

Plaintiff.

This action arises from a traffic stop which took place on December 29, 2017, at 10:40 p.m., near the State University of New York at Brockport ("SUNY").  At that time, non-defendant SUNY Police Officer Petritz ("Petritz") stopped a Mercedes sedan for speeding, after it was caught on radar traveling 55 miles per hour in a 40-mile-per-hour zone.[2]  The traffic stop took place near the intersection of Redman Road and New Campus Drive, which is on the edge of the SUNY campus and remote from any campus buildings or residences.[3]

The Mercedes sedan had four occupants: The driver, Dyshieka McFadden ("Dyshieka"); the front seat passenger, Dyshieka's brother, Nazier McFadden ("Nazier"); and the two backseat passengers,   Jordan Holland ("Holland") and Plaintiff, Jeremy Smith ("Plaintiff" or "Smith"). Plaintiff alleges that he had gotten into the car at Dyshieka's residence in Rochester at approximately 9:45 p.m. after finishing his work shift at a restaurant,[4] and that the four men had then driven toward the Village of Brockport with no particular plans, except that he intended to meet a girl in Brockport with whom he had been communicating on social media.[5]

Officer Petritz, upon walking up to the stopped Mercedes, observed that the four men were moving around inside the vehicle.[6]  Additionally, while speaking to Dyshieka, Petritz observed, and remarked upon the fact, that "the car smelled like weed."[7]  Dyshieka was unable to produce for Petritz a driver's license, other identification or vehicle registration.[8]  Petritz requested additional police assistance, and three officers from the Village of Brockport, namely, Clawson, McCracken and Officer Zach Wakefield ("Wakefield"), arrived at the scene in separate

---

[2] ECF No. 23-12 at p. 10.
[3] ECF No. 23-12 at p. 10.
[4] 50-h Hearing, ECF No. 23-5 at pp. 12, 14.
[5] 50-h Hearing, ECF No. 23-5 at pp. 13–14, 17–18.
[6] *See*, Body-worn camera footage.
[7] 50-h Hearing, ECF No. 23-5 at p. 19.
[8] 50-h Hearing, ECF No. 23-5 at pp. 19–20.

patrol cars.

   Petritz informed Clawson, McCracken and Wakefield that he had stopped the vehicle for speeding, that the vehicle also had improperly tinted windows, and that the interior of the car smelled strongly of burnt marijuana.[9]

   Beginning with Dyshieka, the officers then removed the four men from the vehicle and patted them down.  As Petritz patted down Dyshieka, he again commented that the car smelled of marijuana, and asked Dyshieka why he and his passengers had been reaching around in the vehicle after it was stopped.  Dyshieka responded that they had been looking for his "vehicle registration book" which was "in the back seat somewhere,"[10] though neither the registration nor such a book was ever found.  Petritz then indicated that he had seen marijuana blunts in the vehicle's ashtray and asked if the men had been smoking marijuana, to which Dyshieka responded in the affirmative, though he indicated that it had been "way earlier" in the day.  Dyshieka also admitted that he was on probation.  Petritz then insisted that Dyshieka smelled very strongly of marijuana, as if he had "just smoked" a few minutes earlier, and Dyshieka admitted that he had "just smoked."  The pat-down discovered a large amount of cash ($6,300) in small bills in Dyshieka's pocket. When Petritz asked Dyshieka why he was carrying that much money, Dyshieka asserted that he worked delivering newspapers and had just received his Christmas bonus. Petritz then handcuffed Dyshieka and placed him in a patrol car.[11]

---

[9] *See, e.g.*, ECF No. 23-12 at p. 11 ("Petritz detected an overpowering smell of burnt marijuana.").
[10] Wakefield body-worn camera footage.
[11] Wakefield body-worn camera footage.

Wakefield then removed Holland from the car and patted him down.  When Holland asked why he was being detained, Wakefield stated it was because "there was weed in the car."[12] Wakefield asked Holland what he and the others were doing and where they were headed, and Holland vaguely responded that they were dropping someone off, although he did not know where.  In response to Wakefield's questions about marijuana in the car, Holland indicated that he did not know anything about any marijuana.  Wakefield asked Holland to admit at least that the car smelled strongly of marijuana, but Holland responded that he did not think so, to which Wakefield scoffed that the odor of marijuana had "hit him right in the mouth" when he opened Holland's car door.  After Wakefield did not find any contraband on Holland, he placed Holland in a patrol car.

The officers then patted down Plaintiff and Nazier, more or less simultaneously.  Petritz performed the pat-down of Plaintiff but found no contraband.  Petritz then handcuffed Plaintiff and placed him in a patrol car.  At this same time, Wakefield searched inside the Mercedes but did not find any contraband.

Meanwhile, Clawson patted down Nazier and found approximately $800 in small bills in Nazier's pocket.  Clawson then told Nazier, "You reek of weed," and Nazier agreed and admitted that he had marijuana on him.  Nazier stated that he had a "dime" in his coat pocket, and that he had been preparing a blunt to smoke prior to the traffic stop.  As Clawson searched Nazier's coat pockets, McCracken, who was holding Nazier's arm, commented that Nazier was squirming "a bit too much" and trying to pull away from her, which made her think he had more contraband on him than he was admitting. No marijuana was found in Nazier's coat pocket, contrary to what he had told Clawson.  Clawson then announced that he was going to conduct a full search of

---

[12] Body-worn camera footage.

Nazier's person, at which point Nazier admitted that he had marijuana hidden in his crotch. Clawson then retrieved 21.5 grams of marijuana, wrapped in thirteen separate plastic bags, from inside Nazier's underpants.   Clawson remarked that Nazier must be selling marijuana, based on the amount of cash and marijuana he was carrying, but Nazier denied it and claimed that he smoked a lot of marijuana and had just purchased his supplier's entire stock.  When asked who his supplier was, Nazier stated that he bought the marijuana from "a white kid named Sam." When asked where the purchase took place, Nazier indicated that he would not say unless his handcuffs were removed.

After finding the marijuana in Nazier's crotch, the officers decided to re-search the other three occupants in a more-thorough fashion.  In that regard, after the discovery of the cash on both Dyshieka and Nazier, and the marijuana on Nazier, McCracken commented that the officers should re-search the other three occupants, since based on the amount of marijuana and cash involved, she doubted that Nazier was the only one possessing narcotics.   Thereafter, the officers re-searched Dyshieka, Holland and Plaintiff, starting with Dyshieka.

Clawson first asked Dyshieka if he had drugs concealed on him, and Dyshieka denied having any.  Dyshieka further indicated that he would not possess drugs since he was on probation, and that he had been unaware that his brother possessed marijuana.  Clawson told Dyshieka that despite what Dyshieka was telling him, the story was "not adding up."  Dyshieka, though, insisted that he was Nazier's "guardian," and therefore would not approve of Nazier being involved with drugs.  Dyshieka further reiterated that the cash he possessed was from his job delivering newspapers and that he did not have any narcotics on his body.  Upon shining a light into Dyshieka's underwear, Clawson spotted a white object and asked Dyshieka what it was, to which Dyshieka responded that he "had no clue."  Clawson then retrieved a package of

crack cocaine.  Dyshieka nevertheless insisted to Clawson that he did not know how the drugs came to be in his pants.

Clawson then indicated that because Dyshieka and Nazier had concealed drugs inside their underwear, he was going to re-search Holland and Plaintiff more thoroughly to see if they were also concealing drugs.  The officers re-searched Holland, including inside of his underwear, but found no contraband.

The officers then searched Plaintiff.  The body-worn camera footage indicates that Clawson first performed an extensive pat-down of Plaintiff's pants in the areas of his waistband, pockets and crotch.  During the search of his clothing Plaintiff admitted that he had an empty "dime bag" of marijuana in his pocket.  Officer Petritz commented that the bag contained marijuana "residue" for which Plaintiff might be charged, and Plaintiff expressed doubt that he could be charged merely for having residue.  When asked about the other occupants of the car, Plaintiff indicated that he had known them all since they attended middle school together. Plaintiff insisted that none of the men sold drugs.  When asked why Dyshieka and Nazier were carrying so much cash, Plaintiff responded that they "didn't fuck with banks" and that they were "stingy" and "saved all their money."

Clawson then prepared to search inside Plaintiff's pants and stated, "Looking in the crotch, sir, ok?", to which Plaintiff responded, "Go ahead, nothing in there besides the meat," which caused the officers to laugh.  Clawson responded, "Good to know."  Plaintiff further stated, "You might have to unbuckle the belt, it's tight as hell."  Clawson remarked that Plaintiff's belt had Batman logos on it, and Plaintiff responded that he had a similar belt with Cadillac logos on it.  The casual tone of the interaction changed suddenly, however, when Clawson went to look inside Plaintiff's underwear. Specifically, Plaintiff stated, "There ain't nothing in there but my

meat, bro, and I'm pretty sure you're not supposed to be looking down my pants like that, pretty sure this is an illegal search," and Clawson responded, "Actually it's not."  Plaintiff retorted, "It is if you're looking at my penis," to which Clawson stated, "No, it's not [illegal]."  Plaintiff then said, "You can go down there, you can take them all the way down if you want but there's nothing in there, but I'm pretty positive you're not supposed to be looking at my dick," to which Clawson responded, "Actually I'm pretty positive I know my job better than you do." *See*, generally, ECF No. 23-11, Clawson Affidavit, Exhibit B.  This search was negative for any contraband.  The search of Plaintiff lasted approximately three minutes in total.  The portion of the search that involved Clawson looking into Plaintiff's underwear with a flashlight lasted a few seconds.

The officers eventually charged Dyshieka and Nazier related to their possession of cocaine and marijuana, respectively, but released Plaintiff and Holland. [13]  Plaintiff estimates that he was detained for about an hour, most of which he was in handcuffs.[14]

On May 15, 2018, Plaintiff was examined under oath pursuant to Section 50-h of New York General Municipal Law ("50-h hearing").  During the examination, Plaintiff indicated that prior to the traffic stop, nobody in the car had been smoking marijuana and the car did not smell of marijuana.[15]  Plaintiff also stated that he was not a marijuana user.[16]  However, such testimony is refuted by the body-cam footage, in which Dyshieka admitted that there were burned blunts in the ashtray and that he had "just smoked" prior to being pulled over, Nazier admitted that he reeked of marijuana and had been preparing another blunt to smoke prior to being pulled over, and Plaintiff admitted that he had a used marijuana dime bag in his pocket.[17]  Plaintiff also

---

[13] 50-h Hearing, ECF No. 23-5 at p. 30.  After searching the car once and the men twice, the officers also called in a K-9 drug-sniffing dog, but, again, no contraband was found in the car. Pl. Deposition, ECF No. 23-5 at pp. 37–38 (K-9 dog).

[14] 50-h Hearing, ECF No. 23-5 at pp. 25, 40–41.

[15] 50-h Hearing, ECF No. 23-5 at p. 15, 19.

[16] 50-h Hearing, ECF No. 23-5 at p. 21.

[17] Evidently the 50-h hearing took place before the officers' body-cam footage was produced in discovery.

testified during the examination that "everyone" had seen his exposed penis during the search,[18] including female Officer McCracken.  However, Plaintiff's attorney later acknowledged, during McCracken's deposition, that such accusation was not true since the officers' body-cam footage showed that McCracken had turned away when Clawson searched inside Plaintiff's underwear.[19]

Plaintiff commenced a civil action against Defendants in New York State Supreme Court, Monroe County.  On May 31, 2019, Defendants removed the action to this Court.  On September 30, 2019, Plaintiff filed the operative Amended Complaint, ECF No. 11, purporting to assert tort claims under New York State Law as well as claims under 42 U.S.C. § 1983 ("Section 1983").  More specifically, the Amended Complaint asserts the following seven claims: 1) state law cause of action for false arrest and false imprisonment; 2)  state law cause of action for assault; 3) state law cause of action for battery; 4) state law cause of action for intentional infliction of emotional distress ("IIED"); 5) state law cause of action for negligent infliction of emotional distress ("NIED"); 6) state law cause of action for negligent hiring, retention, training or supervision; and 7) Section 1983 cause of action for violation of Plaintiff's federal rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.

On September 17, 2020, Plaintiff deposed defendant Clawson.  Clawson asserted, in pertinent part, that there had been probable cause to search Plaintiff.  Notably, in that regard, Clawson asserted that Dyshieka's car and each of its occupants smelled strongly of marijuana, and that his discovery of marijuana in Nazier's underwear, and his subsequent discovery of

---

[18] 50-h Hearing, ECF No. 23-5 at pp. 36–37, 45, 46 ("I was sexually assaulted in front of a female officer.").
[19] Pl. Dep., ECF No. 23-5 at pp. 32–34, 45–46.  McCracken's body-worn camera footage indicates that she was looking away from Plaintiff as he was being searched, and Plaintiff's counsel noted that fact during McCracken's deposition. *See*, ECF No. 23-9 at 30 ("Q. [F]rom your testimony[,] from the body cam footage it does not appear that you personally witnessed the search underneath the clothing. A. Correct."); *see also, id.* at 33 (Plaintiff's counsel to McCracken: "I've acknowledged that you have not actually sort of put your eyes on the search of the undergarments.").

cocaine in Dyshieka's underwear, gave him probable cause to search Plaintiff's underwear. Clawson did not indicate that Plaintiff had given him consent to search.  Clawson also indicated, contrary to Plaintiff's testimony at the 50-h hearing, that he never actually touched Plaintiff's genitalia during the search.[20]

On September 30, 2020, Defendants filed the subject Motion for Summary Judgment, ECF No. 23.  Defendants initially note that it was Petritiz, and not they, who decided to stop and detain the men, though they do not dispute that Petritz's decision in that regard was appropriate. The motion, though, does not attempt to address whether it was appropriate, based on the state of facts known at the time, for Petritz to detain Plaintiff, by handcuffing him and placing him in a patrol car.   Rather, Defendants' motion is focused only on the legality of the second, more-thorough, search of Plaintiff by Clawson, which took place thirty or forty minutes after Plaintiff was detained.  Defendants maintain that if such *search* was legal then all of Plaintiff's claims fail. *See*, Def. Mem. of Law, ECF No. 23-2 at pp. 1–2 ("Plaintiff's state law claims for assault, battery, false arrest and imprisonment, infliction of emotional distress, and a negligent hiring claim against the Village, all arise from the search and must also be dismissed because the search was lawful, and the Officer's actions in performing the search were reasonable.").  In that regard, Defendants maintain that the search was proper, both because Plaintiff consented to it and because Clawson had probable cause based on the totality of the circumstances:

> Based upon the availability of the video and audio of the search, the defense requests the court determine the search of Plaintiff's underwear was consensual, and therefore reasonable as a matter of law.
>
> \*\*\*
>
> [Additionally,] the Defendant Officers clearly had reasonable grounds to believe that the Plaintiff was concealing drugs.

---

[20] Clawson Dep., ECF No. 23-8 at p. 42.

In the instant case the Officers had knowledge that the vehicle reeked of marijuana and that the driver of the vehicle, as well as the first passenger searched, possessed thousands of dollars in small denominations, based upon SUNY Officer Petritz' initial stop of the vehicle and search of the driver. Moreover, prior to searching Plaintiff, they knew that the front seat passenger had concealed thirteen bags of marijuana in his underwear. The Officers also knew that the driver of the vehicle denied having drugs on his person, but upon a search was found to have cocaine hidden in his groin area beneath his underwear. Additionally, the occupants of the vehicle had no coherent explanation of where they were going or what they were doing in the area with large amounts of cash and drugs; all circumstances suggesting that individuals were involved in drug sales. Based on all these facts, the Officers had probable cause to believe that Plaintiff also had illicit drugs concealed within his underwear, and that a search was warranted.

ECF No. 23-2 at pp. 6–7.

Defendants also cite *People v. Chestnut*, 43 A.D.2d 260, 261 (3d Dept. 1974), *aff'd* 36 N.Y.2d 971, 973 (1975) ("*Chestnut*") for the proposition that "[t]he smell of marihuana smoke, with nothing more, can be sufficient to provide police officers with probable cause to search an automobile and its occupants." Defendants recognize that this Court has disagreed with *Chestnut*, and has held, pursuant to federal law, that that the smell of marijuana smoke, without more, does *not* provide probable cause to search the occupants of a vehicle. See, *U.S. v. Brock*, 13-CR-6025 CJS ("*Brock*"). Defendants argue, however, that *Brock* is inapplicable here, since the decision to search Plaintiff was based on more than just the smell of marijuana smoke.

In support of their probable cause argument, Defendants have submitted, along with the aforementioned exhibits, largely-identically-worded affidavits from Clawson and McCracken,[21] which basically indicate that they initially acted in reliance on what they were told by Petritz. For example, the affidavits state that Petritz told the other officers that the Mercedes had been speeding, that the windows were tinted and that a strong odor of marijuana emanated from the

---

[21] ECF Nos. 23-10 and 23-11.

vehicle.  Clawson and McCracken also indicate that it was Petritz who first decided that the occupants of the car should be detained, based on the strong smell of marijuana that he observed coming from the vehicle.[22]

The affidavits further indicate that during the investigative detention, the officers gained probable cause to search Plaintiff.  For example, the affidavits by Clawson and McCracken reiterate that both Dyshieka and Nazier had narcotics hidden in their underwear and were carrying large sums of cash. *Id*.  The affidavits then both further state as follows:

> 10. At the time of the search of the Plaintiff, I believed the search was lawful and justified.  The initial stop was for a vehicle and traffic violation and I relied upon Officer Petritz['s] representation that the stop was for speeding.  The windows of the vehicle were dark tinted and presumably unlawful in New York.  I relied upon Officer Petritz['s] information that the vehicle had a strong odor of marijuana and further smelled a strong odor of marijuana on each of the vehicle occupants when they were removed from the vehicle.  Additionally, the driver of the vehicle admitted the individuals had smoked marijuana in the vehicle that day.

> 11. Having cocaine and marijuana hidden in the crotch of the first two individuals, all indications were that these individuals were likely out to Brockport to sell marijuana or cocaine.  As a result of all the information then and there existing, I as well as the other officers present believed the search of Plaintiff as it was conducted was authorized under existing law.

*Id*. at ¶ ¶ 10–11.

Clawson's affidavit further indicates that he believed Plaintiff consented to the search, and that the scope and manner of the search were reasonable:

> 12. In addition to the search being justified in the first instance [by probable cause], the Plaintiff himself indicated twice that I was free to search his genital area.  I told him I had to search his crotch area and he stated, as heard on the video, "go ahead."  He also stated that I would need to loosen his belt, given further evidence of his consent and additionally that I could take his pants "all the way off."[23]  While

---

[22] ECF Nos. 23-10 and 23-11.
[23] Actually, as noted earlier, Plaintiff stated that Clawson could take the pants "all the way down," not "all the way off."

Plaintiff clearly was uncomfortable with the search and said he thought it was illegal, at the very same time he was consenting to the search.  Either way, I was certainly of the impression that he was consenting to the search, perhaps because he wanted to be released and he believed we would find no drugs on his person, which was confirmed by the search.

13.  I would note that the search of the crotch area was visual only, with the Plaintiff's pants pulled forward from the area of the belt and a flashlight shown down his pants.  Unfortunately, this is necessary, as like the two individuals in the front seat of the car, drug toting individuals often hide the contraband they carry in the crotch area to attempt to avoid detection.  Additionally, in the winter with one or more thick items of clothing on, it becomes more difficult to determine exactly what you are feeling while conducting an exterior pat down.  In this instance, that[24] was further complicated by the denials of the front seat occupants that they had any illegal drugs when in fact they did have both marijuana and cocaine tucked away in the genital area after having denied having any contraband on their person at all.

14. Because of these circumstances, I reasonably believed it was likely that the Plaintiff, just like the front seat occupants, also had unlawful drugs secreted in the crotch area necessitating the search.  Further, the search was conducted on the side of a dark road, next to a patrol car, with there being very little traffic on a dark and cold night.  This was the most expeditious way to conduct the search and get any individuals who were not possessing [drugs] on their way.

Clawson Affidavit, ECF No. 23-11 at ¶ ¶ 12–14.

Alternatively, Defendants argue that even if there was no consent or probable cause, they

are entitled to qualified immunity.  On that point, Defendants state, in pertinent part:

[T]he Defendant Officers had [at least arguable] probable cause to believe that the Plaintiff was concealing drugs within his underwear, just as two of his fellow vehicle passengers had.  Therefore, it was reasonable to search Plaintiff, and doing so did not violate any clearly established constitutional right.  Moreover, the scope of the search was objectively reasonable, and involved a visual inspection of Plaintiff's groin because other individuals with whom Plaintiff was traveling had secreted

---

[24] Insofar as Clawson is implying that the search of Plaintiff's underwear was necessary because Plaintiff was wearing multiple layers of clothing, there is no support for that suggestion, and, indeed, Plaintiff testified that he was wearing a single, loose-fitting pair of pants.  (Dyshieka, on the other hand, was wearing multiple layers of pants and shorts).  Moreover, the "multiple layers of clothing" explanation is not a factor that Clawson cited at deposition when explaining his decision to search Plaintiff.

drugs in that area of their bodies.

ECF No. 23-2 at p. 11.  For these reasons, Defendants argue that they are entitled to judgment on Plaintiff's Section 1983 claim.

Defendants also maintain that they are entitled to summary judgment on Plaintiff's state-law claims against the defendant officers for the same reasons already discussed.  Namely, they contend that "tort liability cannot be predicated upon a lawful search."[25]  Defendants further contend that the Village of Brockport is entitled to summary judgment on Plaintiff's state-law claim for negligent hiring, training and supervision since the defendant officers were clearly acting within the scope of their employment when they searched Plaintiff.

On November 20, 2020, Plaintiff filed a response, consisting only of a Memorandum of Law, ECF No. 26.  As an initial matter, Plaintiff disputes Defendants' contention that his claims rise or fall based entirely on the legality of the search by Clawson.  Instead, Plaintiff concedes only that the traffic stop and initial pat-down were justified, and disputes the legality of everything that followed, namely, the handcuffing, placement in the police car and search.[26]  More specifically, the Court understands that Plaintiff is challenging the legality of the handcuffing, detention in the police cruiser, and search of his body and clothing, which took place even though the initial pat-down gave no indication that he was carrying weapons or contraband.[27]  Plaintiff, though, does not go beyond the scope of Defendants' motion and offer a legal argument for why the handcuffing and detention were unlawful, but, instead, responds only to Defendants' arguments concerning the search by Clawson.

---

[25] ECF No. 23-2 at p. 16.
[26] ECF No. 26 at p. 1 (Summarizing Plaintiff's argument as being that, "assuming *arguendo* the initial pat-down search of plaintiff was lawful, the handcuffing, detention, second pat-down, and the visual cavity search of Plaintiff's groin were not.").
[27] *See*, Pl. Mem. of Law, ECF No. 26 at p. 10 ("Once Ofc. Petritz patted down Plaintiff, emptied his pockets and found nothing, there was no lawful reason to search Plaintiff further.").

With regard to that search, Plaintiff first indicates that he never consented to it, but, rather, objected during the search and called it illegal.   Alternatively, Plaintiff states that even if he "putatively consented to the search," there is still an issue of fact as to whether he gave such consent *voluntarily*, stating in pertinent part:

> In the instant case, where Plaintiff was frisked, handcuffed, locked in a police cruiser, then after some time taken out of the cruiser and frisked again, all while standing on the side of a road surrounded by four police officers, Plaintiff's words to the effect of "go ahead, there is nothing inside there besides the meat," accompanied by nervous laughter, can hardly be said to constitute a voluntary consent.

ECF No. 26 at p. 9.

Plaintiff further maintains that Defendants' probable cause argument is contrary to law, since according to *Ybarra v. Illinois*, 444 U.S. 85, 86 (1979), a person's "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."   On this point, Plaintiff contends that Defendants searched him based only on what they found on Dyshieka and Nazier.[28] *See*, Pl. Mem. of Law, ECF No. 26 at p. 10 ("Once Ofc. Petritz patted down Plaintiff, emptied his pockets and found nothing, there was no lawful reason to search Plaintiff further.").

Plaintiff further maintains that Defendants are not entitled to qualified immunity since at the relevant time it was well settled both that persons have the right to be free of warrantless searches and seizures without probable cause, and that "officers do not have probable cause to

---

[28] Plaintiff also argues that Defendants' attempted reliance on New York's Chestnut decision is mistaken, since there is no indication that the officers observed marijuana smoke, as opposed to the mere odor of marijuana. Plaintiff additionally points out that, as discussed earlier, this Court's decision in Brock held, contrary to Chestnut, that the generalized smell of marijuana alone emanating from an automobile does not give police carte blanche to search the vehicle's occupants.

search a person merely because the person is nearby other persons who are suspected of committing a crime."[29]  Plaintiff also contends, based on this Court's ruling in *Brock*, that "it was also clearly established law that the generalized smell of marijuana alone emanating from a vehicle does not provide probable cause to search the vehicle occupants."[30] [31]  Lastly, Plaintiff maintains that his "state law claims remain valid," since "issues of material fact remain in dispute as to the lawfulness of the officers' conduct."[32]

On December 18, 2020, Defendants filed a reply, ECF No. 27, in which they essentially reiterate the arguments in their moving brief, emphasizing both that the decision to search of Plaintiff was based on more than Plaintiff's "mere propinquity" to other persons suspected of criminal activity and that they had "reasonable grounds to believe that Plaintiff was concealing drugs on his person."[33]

DISCUSSION

*Rule 56*

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56.  Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to

---

[29] ECF No. 26 at p. 11.

[30] ECF No. 26 at p. 11.

[31] Additionally, Plaintiff contends "it was also clearly established law that the Fourth Amendment precludes *visual body cavity searches* of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." ECF No. 26 at p. 12 (emphasis added).  However, the Court does not consider this argument, since for reasons discussed below the Court does not consider the search inside Plaintiff's underwear to be a "body cavity search" or even a "visual body cavity search," but, rather, a "reach-in search" which is far less invasive. *See, Bobbit v. Marzan*, No. 16 CIV. 2042 (AT), 2020 WL 5633000, at *9 (S.D.N.Y. Sept. 21, 2020) ("The Second Circuit has defined three categories of intrusive searches of an arrestee's person: (1) a 'strip search' occurs when a suspect is required to remove his clothes; (2) a 'visual body cavity search' is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a 'manual body cavity search' occurs when the police put anything into a suspect's body cavity, or take anything out.") (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)).

[32] ECF No. 26 at p. 12.

[33] ECF No. 27 at p. 4.

16

any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).
A party seeking summary judgment bears the burden of establishing that no genuine issue of
material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26
L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for
obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, §
56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will
bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an
absence of evidence to support an essential element of the nonmoving party's claim." *Gummo
v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,
322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing
that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986).[34] To do this, the non-moving party must present evidence
sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The underlying facts
contained in affidavits, attached exhibits, and depositions, must be viewed in the light most
favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8
L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable
inferences in favor of the party against whom summary judgment is sought, no reasonable trier
of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d
Cir.1993).

---

[34] "The substantive law governing the case will identify those facts which are material and 'only disputes over
facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary
judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v.
City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

Significantly, for purposes of this action, a non-movant cannot create a triable issue of fact based on a bare denial of drug activity, where all other evidence of record indicates that such activity was occurring in the non-movant's presence.[35]  In the instant case, the defendant officers have indicated that Dyshieka's automobile reeked of burned marijuana, Dyshieka admitted that there were smoked blunts in the ashtray and that he had "just smoked" marijuana, and Nazier, who had thirteen bags of marijuana in his pants, admitted that he "reeked" of marijuana and had been preparing to smoke another blunt.  In light of these facts, Plaintiff's "bare denial" that the car smelled of marijuana is insufficient to create a triable issue of fact on that point.  This result is particularly appropriate in this action since Plaintiff's "bare denial" was in his 50-h examination, he did not submit an affidavit in opposition to Defendants' summary judgment motion, and, in any event, his contention is inconsistent with the evidence captured on video, especially the statements of Dyshieka and Nazier. *See, Herrera-Amador v. New York City Police Dep't,* No. 16CV5915NGGVMS, 2021 WL 3012583, at *21 (E.D.N.Y. July 16, 2021) ("Where probable cause is alleged to reside in video evidence, courts should consider that video

---

[35] *See, e.g, United States v. One Parcel of Prop. Located at 15 Black Ledge Drive, Marlborough, Conn.*, 897 F.2d 97, 102 (2d Cir. 1990)* ("The evidence was so 'one-sided' that the government was entitled to summary judgment 'as a matter of law.' *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. In her opposing affidavit, appellant merely asserts that she had no knowledge of drug trafficking taking place from her home, and that her husband never spoke of, consumed or displayed drugs or related materials in her presence. In view of the undisputed facts presented here, we agree with the district court that 'more detailed factual substance in support of her claim of ignorance' was required. . . .  It may be that under some circumstances a claimant's flat denial of knowledge, without more, could suffice to create a genuine issue of fact precluding summary judgment under Rule 56(e). But on these facts, which included the seizure of drugs, drug paraphernalia, large sums of cash and weapons from the common areas and the master bedroom, such a bare denial was insufficient to create a genuine triable issue."); *see also, United States v. One Parcel of Prop., Located at 755 Forest Rd., Northford, Conn.*, 985 F.2d 70, 73 (2d Cir. 1993) ("[T]he abundance and visibility of the narcotics evidence contradict any contention that Franco took all reasonable steps to prevent the illegal use of the property. A denial of the existence of drug paraphernalia that is in a person's plain view is not consistent with a claim that the person made all reasonable efforts to eliminate drug activity. *See 141st Street*, 911 F.2d at 879–80. The visible drug evidence thus distinguishes 418 57th Street, where we found a genuine dispute to exist[.]"); *United States v. $7,877.61 U.S. Currency,* No. 09-CV-6306P, 2015 WL 5719811, at *9 (W.D.N.Y. Sept. 30, 2015) ("[B]are denials or conclusory allegations might be found, in light of overwhelming evidence to the contrary, incredible as a matter of law[.]") (citation and internal quotation marks omitted).

18

evidence submitted in connection with a party's summary judgment motion to determine whether material fact issues exist. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). 'When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.' *Id.*"); *see also, Nelson v. Disboro*, No. 918CV657LEKCFH, 2020 WL 7021583, at *4 (N.D.N.Y. Nov. 30, 2020) ("It is well-established that such an evidentiary imbalance demonstrates that a factual dispute is not genuine.") (collecting cases).  Accordingly, for purposes of this Decision and Order the Court accepts that the car and occupants smelled strongly of marijuana.[36]

### Section 1983

Section 1983 "is not itself a source of a substantive rights, but merely provides a method for vindication of federal rights elsewhere conferred." *Long v. Crowley*, No. 09BCVB00456A(F), 2012 WL 1202181 (W.D.N.Y. Mar. 22, 2012) (citations and internal quotation marks omitted). To establish individual liability under Section 1983, a plaintiff must show that the defendant acted under color of state law and caused the plaintiff to be deprived of a constitutional right. 42 U.S.C. § 1983.

### Fourth Amendment Seizure

Plaintiff contends that he was improperly seized prior to being searched, in violation of his rights under the Fourth Amendment.  In that regard, after Petritz stopped the Mercedes for speeding, Plaintiff was ordered out of the car, handcuffed, patted down, and placed in the rear of a patrol car.  As noted earlier, Plaintiff is willing to assume *arguendo*, for present purposes,

---

[36] Even assuming *arguendo* that Plaintiff did not personally partake of the marijuana being smoked in the car immediately prior to the traffic stop, the Court has little doubt that his clothing would bear the odor of that marijuana .

that the traffic stop, the removal of the occupants from the vehicle and the initial pat-down were all lawful.[37]  However, Plaintiff contends, and it is not disputed, that the initial pat-down gave no indication that he possessed a weapon or any type of contraband.  Plaintiff maintains, therefore, that it violated the Fourth Amendment for Defendants to seize him by handcuffing him and placing him in the back of a patrol car while they continued their investigation.

Defendants, meanwhile, do not specifically discuss the handcuffing or placement of Plaintiff into the rear of the police cruiser, except to imply that Petritz was solely responsible for those actions.  However, Defendants could be deemed personally involved in any violation of Plaintiff's constitutional rights by Officer Petritz if they had an opportunity to intervene and failed to do so.

In this regard, personal involvement is a prerequisite for liability under Section 1983, and a police officer is not personally involved in an allege constitutional violation merely because he is present at the scene of an arrest.[38]  However, in actions such as this involving multiple police-officer defendants, a defendant officer may be personally involved either because he directly violated the plaintiff's rights or because he failed to intervene to prevent another officer from violating such rights.[39]

> It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.  An officer who fails to intercede is liable

---

[37] ECF No. 26 at p. 1.

[38] *See, Snead v. City of New York*, 463 F. Supp. 3d 386, 398 (S.D.N.Y. 2020) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.  An officer's mere presence at the scene of a stop or arrest generally does not constitute sufficient personal involvement for § 1983 liability.") (citation and internal quotation marks omitted, collecting cases), *reconsideration denied sub nom. Snead v. LoBianco*, No. 16-CV-09528 (AJN), 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

[39] *See, e.g., Harris v. City of New York*, No. 15-CV-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017) ("To be held liable under § 1983 for false arrest or failure to intervene, an officer must be "personally involved" in an unlawful arrest.  An officer can be personally involved in one of two ways: He can directly participate in the arrest, or he can fail to intervene to stop an unlawful arrest when the evidence establishes that he would have been able to do so.") (citations omitted).

for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; *or (3) that any constitutional violation has been committed by a law enforcement official. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.* Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (emphasis added, citations omitted).

In this action, Defendants were clearly present when Petritz handcuffed Plaintiff and placed him in the patrol car, and were privy to the same information as Petritz, since Petritz had told them what he had observed during the traffic stop that made him think further investigation was warranted. Consequently, the fact that Plaintiff was handcuffed and placed in the police cruiser by Petritz does not end the inquiry into his seizure claim against Defendants.

The Fourth Amendment protects persons from unreasonable seizures, including but not limited to arrests without probable cause. *See, Williams v. City of New York*, 683 F. App'x 57, 58 (2d Cir. 2017) (Indicating that claims for false arrest under section 1983 rest "on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause.") (citation omitted). Indeed, the Fourth Amendment requires that "[b]efore [a police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980) (citation omitted).

"[T]he first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998). A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not at liberty to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of

circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. However, "mere police questioning does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (internal quotation omitted).

If there was a seizure, the Court proceeds to the second step, which is to determine what type of seizure occurred. There are two relevant types of seizures, each of which requires a different level of justification: (i) an investigatory (or *Terry*) stop, which must be based on "a reasonable suspicion supported by articulable facts that criminal activity may be afoot"; and (ii) an arrest, which must be based on probable cause. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Whether a seizure is an arrest or a merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Posr v. Doherty*, 944 F.2d [91,] 98 [(2d Cir. 1991)] (internal citations omitted). "As the level of intrusiveness rises, ... an encounter between the police and a citizen is more properly categorized as an arrest." *Id*.

"A permissible investigative stop may become an unlawful arrest if the means of detention are more intrusive than necessary." *United States v. Wiggan*, 530 F. App'x 51, 55 (2d Cir. 2013) (summary order) (internal quotation omitted). Thus:

> In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*Id*. (internal citation omitted).

*** 

The third and final step is to determine whether the seizure was justified—in other words, whether the officers had reasonable suspicion (if the seizure was an investigatory stop) or probable cause (if the seizure was an arrest). *See Posr v. Doherty*, 944 F.2d at 98. In reviewing whether the officers had reasonable suspicion, "courts evaluate the circumstances surrounding the stop through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (internal quotation omitted). "Even conduct that is as

consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *Id.* (internal quotation omitted).

In contrast, probable cause exists if an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation omitted). "Probable cause does not require absolute certainty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). Indeed, "some exculpatory evidence does not make an arrest illegal when the totality of evidence still establishes probable cause to believe that the suspect committed the crime." *Stansbury v. Wertman*, 721 F.3d 84, 94 (2d Cir. 2013).

*McKenzie v. City of Mount Vernon, et al.*, No. 18 CV 603 (VB), 2018 WL 6831157, at *3-4 (S.D.N.Y. Dec. 28, 2018).

It is not disputed here that the odor of marijuana gave Defendants probable cause to search the Mercedes. *See, e.g., United States v. Holt*, No. 3:21-CR-80 (MPS), 2021 WL 5281366, at *6 (D. Conn. Nov. 12, 2021) ("The Second Circuit has recently held that the odor of marijuana, combined with a defendant's statement that he had been smoking marijuana earlier, justified a search of the defendant's vehicle. *United States v. Goolsby*, 820 F. App'x 47, 49 (2d Cir. 2020) (summary order), *cert. denied* 141 S. Ct. 2818 (2021). And numerous district courts within this Circuit have held, also recently, that the odor of marijuana alone provides probable cause.") (collecting cases). Nor does Plaintiff dispute, for purposes of this Decision and Order, that Defendants were entitled to order him from the vehicle and pat him down. The issue, rather, is whether, after finding nothing during the pat down, Defendants were entitled seize Plaintiff by handcuffing him and placing him in the back of a patrol car while they conducted the automobile search and/or otherwise continued their investigation.

Of course, "[d]uring a *Terry*[40] stop, police may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Gray v. Nordstrom*, No. 3:18CV1402 (KAD), 2020 WL 5709632, at *3 (D. Conn. Sept. 24, 2020) (citation omitted). Moreover, in connection with a valid traffic stop, the odor of marijuana emanating from a vehicle provides reasonable suspicion of legal wrongdoing and justifies officers in continuing the detention of the vehicle's occupants pending further investigation. *See, United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) ("As the officers approached the SUV, they immediately detected an independent basis [(the odor of marijuana)] for continuing to detain the SUV and its occupants. . . .  The officers then had a particularized and objective basis for suspecting legal wrongdoing, and were justified in continuing the detention of the SUV and its occupants.") (citations and internal quotation marks omitted); *see also, United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at *5 (D. Conn. July 24, 2018) ("Detective Pontz was close enough to the vehicle to form a reasonable suspicion that the occupants had recently been smoking marijuana. Thus, the smell of marijuana provided an independent basis for continuing to detain the vehicle and its occupants.") (citing *Jenkins*).

However, during such an investigatory *Terry* detention, officers are not automatically entitled to handcuff a detainee and place him in a patrol car. *See, United States v. Mack*, No. 17-CR-6159-EAW-JWF, 2018 WL 8898465, at *6 (W.D.N.Y. Nov. 29, 2018) ("[A]n officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'") (citation omitted).[41]  More specifically, and as alluded to earlier, the applicable

---

[40] *Terry v. Ohio*, 392 U.S. 1 (1968).
[41] *Report and recommendation adopted*, No. 6:17-CR-06159 EAW, 2019 WL 2590741 (W.D.N.Y. June 25, 2019),

legal principles on this point are well settled:

> For an investigatory stop to be conducted in an "appropriate manner," *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. 1868, the stop must be "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place," *Grice v. McVeigh*, 873 F.3d at 167; *see also United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (stating that permissible *Terry* stop may ripen into *de facto* arrest requiring probable cause if officers "unreasonably used means of detention that were more intrusive than necessary" for stop). Factors generally relevant to that inquiry include the following: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Patterson*, No. 19-4332-CR, --- F.4th--- , 2022 WL 333248, at *10 (2d Cir. Feb. 4, 2022) (citation and internal quotation marks omitted).   "No one of these factors is determinative. But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (citation omitted).  On this point, "it is the Government's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id*.

Here, the Court understands Plaintiff to be arguing that while the traffic stop and initial pat down may have been permissible, the *Terry* stop ripened into a *de facto* arrest unsupported by probable cause when Defendants handcuffed him and placed him in the back of a patrol car for approximately an hour.  Defendants, on the other hand, argue that probable cause existed at the time of the search of Plaintiff's person, but do not discuss why, prior to such search, it was reasonable for Plaintiff to be handcuffed and placed in the rear of a patrol car.  For example,

---

aff'd, No. 20-376-CR, 2021 WL 4851391 (2d Cir. Oct. 19, 2021).

there is no indication in the record that Defendants suspected Plaintiff of possessing a weapon or of otherwise posing a threat to their safety.  Nor do Defendants otherwise attempt to argue that the *Terry* stop was conducted in an appropriate manner considering the factors set forth above.

Defendants may ultimately be able to show that the investigatory detention of Plaintiff was reasonable under the Fourth Amendment, but at this time they have not attempted to do so.  Nor does the Court believe that it would be appropriate in this case to analyze the issue *sua sponte*. Consequently, Defendants' motion is denied insofar as it is directed at the causes of action arising from the detention/seizure of Plaintiff.

### Fourth Amendment Search

The Court will now consider the portion of Defendants' motion directed at Plaintiff's unlawful search claim.  Before doing so, however, the Court notes that even assuming *arguendo* that the pre-search detention of Plaintiff and/or the other occupants of the Mercedes was unlawful, such fact would not mean that the later search was also necessarily unlawful, since the "fruit of the poisonous tree" doctrine does not apply in Section 1983 cases. *See, DiMascio v. City of Albany*, 205 F.3d 1322 (2d Cir. 2000) ("[A]ppellant's theory that the officers lacked probable cause to arrest him is founded on the "fruit of the poisonous tree" doctrine, or, as applied to this case, the notion that the officers necessarily lacked probable cause to arrest him for unlawful possession of the knives and gun because they lacked probable cause to make the stop that led them to discover this evidence. We have held, however, that the fruit of the poisonous tree doctrine is "inapplicable to civil § 1983 actions.") (citing *Townes v. City of New York*, 176 F.3d 138, 145, 149 (2d Cir.), *cert. denied*, 120 S.Ct. 398 (1999)).[42]

_____

[42] At the same time, if probable cause to search Plaintiff was developed after Plaintiff was handcuffed and detained, such probable cause would not excuse an otherwise wrongful prior detention, and Plaintiff could still

Plaintiff maintains that the warrantless search of his body by Clawson violated the Fourth Amendment, since it was not incident to an arrest or based on any particularized probable cause, but was based only on Plaintiff's "mere propinquity" to criminal activity by Nazier and Dyshieka. Defendants, on the other hand, contend that Plaintiff consented to the search and, alternatively, that there was probable cause to search Plaintiff, and even to search inside his underwear, based on the totality of the circumstances.   For reasons discussed below the Court finds that Defendants had probable cause to search Plaintiff, and, alternatively, that even if they did not they are nevertheless entitled to qualified immunity since there was at least arguable probable cause.

"The Fourth Amendment protects against unreasonable searches and seizures[, and w]arrantless searches and seizures are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (footnotes omitted).   Of those limited exceptions, only three appear potentially relevant here: "searches on consent"; "automobile searches based on probable cause to believe the vehicle contains contraband or evidence"; and "searches incident to a lawful custodial arrest." *McCardle v. Haddad*, 131 F.3d 43, 48 (2d Cir. 1997).

With regard to searches on consent, the generally-applicable legal principles are well settled:

> Although normally a search is deemed unreasonable within the meaning of the Fourth Amendment unless it is conducted pursuant to a warrant issued on probable cause, it is well-settled that an exception exists for searches made following voluntary consent by an individual with authority over the place searched. A search based on such consent is considered reasonable within the meaning of

---

recover damages for the period of detention prior to the establishment of probable cause. *See, Townes*, 176 F.3d at 149 ("Townes's only possible damage claim would be limited to the brief invasion of privacy related to the seizure and initial search of his person" prior to the search of the taxi and discovery of illegal handguns that provided probable cause for his arrest).

> the Fourth Amendment, even in the absence of a warrant or probable cause. In order to validate a warrantless search, the consent must be freely and voluntarily given.  The fact that a person is in official custody does not mean that he is incapable of giving his free and voluntary consent.  The voluntariness of a consent depends on the totality of all the circumstances and is a question of fact to be resolved by the district court.

*United States v. Marin*, 669 F.2d 73, 82–83 (2d Cir. 1982) (citations and internal quotation marks omitted); *see also, United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) ("We have repeatedly observed that neither the fact that a person is in custody nor that she has been subjected to a display of force rules out a finding of voluntariness . . . . [Moreover, k]nowledge of the right to refuse, as we have said, is not a requirement to a finding of voluntariness.").

> Consent need not be a knowing waiver of Fourth Amendment rights, but it must be voluntary and that voluntariness is determined upon a review of the totality of the circumstances. The Government bears the burden of demonstrating that consent was voluntarily given, and because defendants frequently claim that their consent was obtained involuntarily or not at all, a judge's decision on the issue will often boil down to a credibility determination.  A number of factors are relevant to determine voluntariness, including the setting in which consent is obtained. Furthermore, the scope of any consent to search is measured by what a reasonable person would have understood based upon the discussion between the officer and the person giving consent.

*United States v. Heleniak*, No. 14CR42A, 2015 WL 521287, at *6 (W.D.N.Y. Feb. 9, 2015) (citations and internal quotation marks omitted).

Here, the Court finds that Defendants have not demonstrated their entitlement to judgment based on consent.  In this regard, at the 50-h hearing Plaintiff was not questioned with any specificity concerning the question of consent,[43] and Clawson did not indicate during his deposition that he had obtained Plaintiff's consent.  However, the entire search was captured by the officers' body-worn cameras, and the footage raises questions as to whether Clawson

---

[43] *See*, Pl. Dep., ECF No. 23-5 at pp. 32–37.

obtained or even sought Plaintiff's voluntary consent.  For example, Clawson was already engaged in performing the second "more thorough" search of Plaintiff's body when he purportedly asked for consent by stating, "Looking in the crotch, sir, ok?"  At that point, Clawson had already searched inside the underwear of Nazier and Dyshieka, and had announced his intention to similarly search the other two passengers, without regard to consent.  Moreover, it appears that Clawson intended to search inside of Plaintiff's underwear, regardless of how Plaintiff might have responded, since Clawson clearly believed that he had the right to do so based on probable cause.  Indeed, Clawson's statement, "Looking in the crotch, sir, ok?," was more of an announcement of what he was about to do than a request for permission.  This is borne out by the fact that when Plaintiff objected to Clawson looking at his genitals, Clawson insisted that he was entitled to do so.[44]  In sum, there is a question as to whether Clawson even sought consent prior to the search.  Further, regarding the scope of any consent, to the extent Plaintiff consented to the search at all, he evidently did not understand, from Clawson's reference to "the crotch," that Clawson would be looking at his exposed genitals and would not have consented if he had.  Rather, it appears that at most Plaintiff may consented to the search of the clothing around crotch area, because he knew that there was no contraband concealed there, but did not consent to Clawson looking inside his underwear.[45]   For these reasons the Court finds that Defendants have not demonstrated their entitlement to judgment based on consent to the search.

---

[44] Similarly, the body-cam footage indicates that Holland strenuously and unequivocally objected when Clawson indicated that he was going to search in Holland's pants, but Clawson indicated that he was entitled to search regardless of consent.

[45] *See, Reeves v. Anderson*, No. 11-CV-3770 SAS, 2014 WL 7336459, at *4 (S.D.N.Y. Dec. 24, 2014) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?") (footnotes and citations omitted).

Similarly, Defendants have not shown that the search of Plaintiff's body was permissible under the "automobile exception," which

> permits law enforcement officers to search without a warrant a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband. If the exception applies, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search. Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that evidence of a crime will be found in the place to be searched.

*United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) (citations and internal quotation marks omitted).

Here, while the odor of marijuana emanating from the Mercedes justified the search of the vehicle, it did not justify the search of Plaintiff's body. Rather, in *Brock*, this Court previously stated:

> [A]s to the automobile exception, it is undisputed that the police, based upon the generalized smell of marijuana, had the right to search the defendant's vehicle and any containers within the vehicle where marijuana might be stored. *United States v. Ross*, 456 U.S. 798, 102 S. Ct. 2157, 72 L.Ed. 2d 572 (1982). However, the Court does not believe that the generalized smell of marijuana alone gave the police carte blanche, pursuant to the automobile exception, in and of itself, the right to search the person of the defendant or for that matter any other occupant. In other words, the Court does not believe that the generalized odor of marijuana, without more, gave the police the right to search the person of the defendant, who was the driver of the car, or the two passengers.

*United States v. Brock*, No. 13-CR-6025, 2016 WL 3743242, at *2 (W.D.N.Y. July 13, 2016); *see also, United States v. Di Re*, 332 U.S. 581, 587, 68 S. Ct. 222, 225, 92 L. Ed. 210 (1948) ("We are not convinced that a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled."); *Wyoming v. Houghton*, 526 U.S. 295, 303, 119 S. Ct. 1297, 1302, 143 L. Ed. 2d 408 (1999) ("*United States v. Di Re*, 332 U.S.

581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), held that probable cause to search a car did not justify a body search of a passenger. And *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), held that a search warrant for a tavern and its bartender did not permit body searches of all the bar's patrons. These cases turned on the unique, significantly heightened protection afforded against searches of one's person."); *Wyoming v. Houghton*, 526 U.S. at 308, 119 S. Ct. at 1304 ("Obviously, the rule applies only to automobile searches. Equally obviously, the rule applies only to containers found within automobiles. *And it does not extend to the search of a person found in that automobile*. As the Court notes . . . the search of a person, including even a limited search of the outer clothing, is a very different matter in respect to which the law provides significantly heightened protection.") (emphasis added, citations and internal quotation marks omitted) (Breyer, J., concurring); *Collins v. Virginia*, 138 S. Ct. 1663, 1671, 201 L. Ed. 2d 9 (2018) ("[T]he scope of the automobile exception extends no further than the automobile itself.").  Consequently, insofar as Defendants' motion is based on the automobile exception, it is denied.

However, the Court agrees that Defendants have shown that the warrantless search was supported by probable cause and therefore fits under the search-incident-to-arrest exception. "Probable cause to arrest requires that the totality of facts and circumstances known to the police permit a person of reasonable caution to conclude that there is a 'fair probability' that the person to be seized has committed or is committing a crime." *U.S. v. Patterson*, --- F.4th ---, 2022 WL 333248 at *6; *see also, U.S. v. Babilonia*, 854 F.3d at 178 ("Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that evidence of a crime will be found in the place to be searched.") (citation and

internal quotation marks omitted).

> It is well settled that probable cause requires more than suspicions, even reasonable ones. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.] *Cf. Ybarra*, 444 U.S. at 91, 100 S.Ct. 338. ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). Thus, in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court held that police did not have probable cause to search patrons of a bar for heroin merely because they had reliable information that the bartender used the establishment to sell narcotics to customers. *Id*. Instead, the Court held that "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id*[.]

*Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) (other citation omitted).

Significantly, the requirement that probable cause be particularized as to the person to be searched or seized

> *cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another* or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

*Ybarra v. Illinois*, 444 U.S. at 85, 100 S. Ct. at 342 (emphasis added, citations omitted).

In *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795 (2003), the Supreme Court applied the foregoing legal principles to a case in which police had arrested a front-seat-passenger of a car in which $763 had been found in the glove compartment and five baggies of cocaine had been found in the armrest of the backseat, near where another passenger was seated.  Neither the driver, nor the front-seat passenger nor the backseat passenger admitted to having any connection to the cash or drugs.  Nevertheless, in finding that there had been probable cause to arrest the front-seat passenger, the Court stated:

To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.

In this case, Pringle was one of three men riding in a Nissan Maxima at 3:16 a.m. There was $763 of rolled-up cash in the glove compartment directly in front of Pringle.  Five plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three men. Upon questioning, the three men failed to offer any information with respect to the ownership of the cocaine or the money.

We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

Pringle's attempt to characterize this case as a guilt-by-association case is unavailing. His reliance on *Ybarra v. Illinois*, supra, and *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), is misplaced. In *Ybarra*, police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance.  Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra. Inside a cigarette pack retrieved from Ybarra's pocket, an officer found six tinfoil packets containing heroin. We stated:

> "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York*, 392 U.S. 40, 62–63[, 88 S.Ct. 1889, 20 L.Ed.2d 917] (1968). Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." 444 U.S., at 91, 100 S.Ct. 338.

We held that the search warrant did not permit body searches of all of the tavern's patrons and that the police could not pat down the patrons for weapons, absent individualized suspicion. *Id*., at 92, 100 S.Ct. 338.

This case is quite different from *Ybarra*. Pringle and his two companions were in a relatively small automobile, not a public tavern. In *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999), we noted that "a car passenger— unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.*, at 304–305, 119 S.Ct. 1297. Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

In *Di Re*, a federal investigator had been told by an informant, Reed, that he was to receive counterfeit gasoline ration coupons from a certain Buttitta at a particular place. The investigator went to the appointed place and saw Reed, the sole occupant of the rear seat of the car, holding gasoline ration coupons. There were two other occupants in the car: Buttitta in the driver's seat and Di Re in the front passenger's seat. Reed informed the investigator that Buttitta had given him counterfeit coupons. Thereupon, all three men were arrested and searched. After noting that the officers had no information implicating Di Re and no information pointing to Di Re's possession of coupons, unless presence in the car warranted that inference, we concluded that the officer lacked probable cause to believe that Di Re was involved in the crime. 332 U.S., at 592–594, 68 S.Ct. 222. We said "[a]ny inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person." *Id.*, at 594, 68 S.Ct. 222. No such singling out occurred in this case; none of the three men provided information with respect to the ownership of the cocaine or money.

We hold that the officer had probable cause to believe that Pringle had committed the crime of possession of a controlled substance. Pringle's arrest therefore did not contravene the Fourth and Fourteenth Amendments.

*Maryland v. Pringle*, 540 U.S. 366, 371–74, 124 S. Ct. 795, 800–02, 157 L. Ed. 2d 769 (2003).

"As probable cause is an objective question, the arresting officer's subjective belief as to its existence is immaterial[.]" *Root v. Loucks*, No. 19-CV-03093 (PMH), 2021 WL 3727611, at *5 (S.D.N.Y. Aug. 20, 2021). Rather, "[t]he test for probable cause is an objective one and depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Hernandez v. City of New York*, No. 1:18-CV-6418-GHW, 2022 WL 316938,

34

at *6 (S.D.N.Y. Feb. 2, 2022) (citation and internal quotation marks omitted); *see also, Silver v. Kuehbeck*, 217 F. App'x 18, 22 (2d Cir. 2007) ("[P]robable cause is not a subjective determination, but rather an objective one. *See United States v. $557, 933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 85 (2d Cir.2002) ("[T]he determination of probable cause is an objective one, to be made without regard to the individual officer's subjective motives or belief as to the existence of probable cause.")")).  Moreover, where, as here, there are multiple officers involved, a court considers the officers' collective knowledge. *See, e.g., Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009) ("[O]ur assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone.") (citation omitted); *see also, Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) ("The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all.") (citation and internal quotation marks omitted).

Applying these principles to the instant case, the Court finds that the facts known to Defendants objectively established probable cause to believe that Plaintiff was involved in the possession and/or sale of narcotics and that evidence of such criminal activity was hidden on his body.  In particular, the following facts were known to the officers: Plaintiff and the other three occupants of the Mercedes were traveling together in a relatively small sedan; the four occupants were long-time associates, who had known each other since middle school; after the sedan was stopped for speeding the men began moving around suspiciously in the vehicle, and when asked why they had been doing so, Dyshieka offered an explanation that was later shown to be untrue; the occupants offered only a vague explanation for where they were going; the automobile and

the occupants reeked of marijuana smoke; there were smoked marijuana blunts in the ashtray located in the console between the two front seats; Dyshieka admitted having "just smoked" marijuana, despite being on probation; Nazier admitted that he had been preparing to smoke a blunt when the car was pulled over for speeding; despite the obvious signs of marijuana having been recently smoked in the car, the supply of such marijuana was not found in the car itself; despite the obvious evidence of marijuana having just been smoked in the sedan, Holland implausibly denied either that he knew anything about marijuana or that the car smelled of marijuana; Dyshieka was carrying over six thousand dollars in cash and implausibly indicated that the money was a Christmas bonus from his job delivering newspapers; Nazier was carrying eight hundred dollars in cash and had twenty-three bags of marijuana concealed in his underwear, and when asked why, indicated implausibly that he had just purchased his drug supplier's entire stock of marijuana for his own use;  Dyshieka had crack cocaine concealed in his underwear and claimed he had no idea how it got there; and when asked about Dyshieka and Nazier, Plaintiff denied that they sold drugs and implausibly explained that they were carry large sums of money because they did not use banks and were "stingy" in that they saved all the money they earned.

Here, as in *Pringle*, the quantity of drugs and cash in the car, along with other facts just enumerated, made it reasonable for Defendants to infer a common enterprise, namely, drug dealing, among the four men.  Admittedly, the inference of drug dealing was especially strong with regard to Dyshieka and Nazier, since the money and drugs were found on them rather than in a common area of the vehicle.  But as the *Pringle* decision recognized, drug dealing is an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.  Moreover, the fact that the drugs and money were found just on

Dyshieka and Nazier did not "single them out" as likely being the only ones involved in possessing or selling drugs where, for example, the officers observed suspicious movements between the front and rear occupants following the traffic stop,[46] Plaintiff offered an implausible explanation for why Dyshieka and Nazier were carrying so much cash,[47] and Holland implausibly denied seeing or even smelling marijuana.

The totality of these circumstances is, in the Court's view, at least as supportive of probable cause as that which was present in in *U.S. v. Patrick*, 899 F.2d 169 (2d Cir. 1990) ("*Patrick*").  In *Patrick* the Second Circuit found that there had been probable cause to arrest the defendant, Patrick, who was carrying no drugs or other contraband on his person, simply because he walked up to a U.S. Customs checkpoint with another person, Taylor, who was later found to possess crack cocaine, and made an "unusual" statement about why he was entering the United States that was identical to what Taylor had said.   Explaining its probable cause finding, the Second Circuit stated:

> The instant case is readily distinguishable from *Ybarra*, for the Customs officials knew something more about Patrick than just his "propinquity" to Taylor. The facts, as found by the district court, reveal that Patrick and Taylor were not merely waiting in line next to each other, along with numerous others, to enter the United States. Rather, they entered the office together, both with knapsacks, at a time when no other civilian pedestrians were about. Most significantly indicating that they were traveling together, they both told Inspector Jasen the unusual story of accidentally crossing the border into Canada on a bus and walking back over the Whirlpool

---

[46] As noted earlier, Dyshieka indicated that the men were reaching around inside the car to locate his "registration book," but the officers were not obliged to credit that explanation, particularly since no such registration book was ever located.

[47] *See, Bradway v. Gonzales*, 26 F.3d 313, 321 (2d Cir. 1994) ("A reasonable officer who found the stove and cans, and who heard plaintiff's implausible explanation for possessing them, would have believed that probable cause existed for plaintiff's arrest."); s*ee also, Diaz v. Albuquerque, New Mexico Police Dep't*, No. CV 00-862 JP/WWD, 2002 WL 35649855, at *3 (D.N.M. July 18, 2002) ("Given Plaintiff's dubious explanation and his driving in a direction that was inconsistent with his explanation, Officer McGrath was not required to believe Plaintiff. . . . Officer McGrath could have reasonably believed that Plaintiff was acting as an accessory to Carlos' attempt to evade apprehension and/or arrest. Thus, Officer McGrath had probable cause to arrest Plaintiff based on his reasonable belief that a crime was being committed by both Plaintiff and Carlos."), *aff'd*, 66 F. App'x 836 (10th Cir. 2003).

Bridge to the United States.

***

Once the Customs officials discovered the cocaine in Taylor's purse, the information they had about Patrick—that he entered the Immigration Office with Taylor at a time when no others were present and that they both had accidentally crossed into Canada—provided an adequate basis for the officials to reasonably believe that Patrick was not just a mere innocent traveling companion but was traveling *and acting in concert with Taylor in transporting the cocaine*. Therefore, the Customs officials had probable cause to arrest Patrick[.]

*Patrick*, 899 F.2d at 171-172 (emphasis added).

It was similarly reasonable for Defendants here to infer that Plaintiff was engaged in a common and unlawful enterprise with Dyshieka and Nazier, and, consequently, Plaintiff was not searched due to his mere presence in the car, contrary to what he maintains. *See, e.g., Elk v. Townson*, 839 F. Supp. 1047, 1052 (S.D.N.Y. 1993) ("In this case, Elk's presence in a vehicle which smelled strongly of marijuana and in which marijuana was found both on another occupant and in a container located near him gave the Sheriff's Office reasonable grounds to suspect that Elk might be hiding drugs on his person."). In sum, the Court finds that there was particularized probable cause as to Plaintiff.

The Court further finds that since there was probable cause to arrest Plaintiff at the time of the search, the warrantless search would come under the search-incident-to-arrest exception even though Defendants never formally arrested Plaintiff. *See, Evans v. Solomon*, 681 F. Supp. 2d 233, 251 (E.D.N.Y. 2010) ("[T]he constitutional linchpin in a search incident to arrest is the probable cause to arrest, not an intention or announcement of formal arrest. Thus, the Court holds that the Fourth Amendment permitted Sgt. Solomon to search Plaintiff's pocket for his identification once he established probable cause to arrest him for the traffic infraction, *even in the absence of* exigent circumstances or *a subsequent arrest*.") (emphasis added); *see also, United States v. Dupree*, No. 16-CR-84 (ARR), 2016 WL 10703796, at *3-5 (E.D.N.Y. Aug. 29,

38

2016) ("The question at issue in this case is whether a search incident to arrest requires an actual arrest to take place, or whether probable cause to make an arrest itself suffices to trigger this exception to the Fourth Amendment's warrant requirement. The Second Circuit answered this question in *United States v. Ricard*, 563 F.2d 45 (2d Cir. 1977), finding that as long as an officer could have lawfully arrested a defendant, the search incident to arrest exception is applicable whether or not an arrest is effected . . . . *Ricard* holds that the authority to arrest always justifies a search incident to arrest, regardless of whether an arrest actually occurs. This holding is consistent with well-established Supreme Court jurisprudence that Fourth Amendment inquiries turn on objective facts, not the subjective intentions of police officers.") (citations omitted), *aff'd*, 767 F. App'x 181 (2d Cir. 2019).[48]

In addition to finding that there was probable cause to arrest, the Court finds that the manner and scope of the search were reasonable. In that regard,

> [i]f a search of a person is found to be justified, it must next be determined if it was conducted in a reasonable manner. When considering the constitutionality of a particular search, courts are to apply a 'test of reasonableness' that balances the need for the search against the invasion of privacy. *Bell v. Wolfish*, 441 U.S. 520, 558–59, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Consideration must be given to the scope of the intrusion, the manner and place in which the search is conducted, and the justification for the search. *Id*. at 559, 99 S.Ct. at 1884.

*Brown v. City of Utica*, N.Y., 854 F. Supp. 2d 255, 261 (N.D.N.Y. 2012). Here, while the parties

---

[48] *But see, People v. Reid*, 24 N.Y.3d 615, 619, 26 N.E.3d 237, 239 (2014) ("A search must be incident to an actual arrest, not just to probable cause that might have led to an arrest, but did not.") (citations omitted); *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 77 (D. Conn. 2016) ("[I]t is debatable whether an encounter that does not end in booking or a formal arrest may be considered an 'arrest' sufficient to trigger the search-incident-to-arrest standard.") (citations omitted); *United States v. Diaz*, 854 F.3d 197, 206 n. 14 (2d Cir. 2017) ("[T]he Sixth and Ninth Circuits have cited *Knowles* [*v. Iowa*, 525 U.S. 113, 119 S.Ct. 484 (1998)], for the proposition that there can be no search or seizure incident to an arrest unless an arrest is made. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1153 (9th Cir. 2005) ("Had [the defendant] been arrested, ample precedent would permit a search or seizure incident to arrest." (internal quotation marks omitted)); *Bennett v. City of Eastpointe*, 410 F.3d 810, 824 (6th Cir. 2005) ("The mere fact that an officer has the authority to arrest an individual does not, and never has, automatically permitted the officer to conduct a pat-down search should he choose not to effectuate the arrest.")).

use different terminology to describe the search, the Court does not consider it to have been a "strip search," "visual strip search" or "body cavity search," but rather, what other federal courts have called a "reach-in search."   A reach-in search, which involves an officer reaching into a suspect's pants without disrobing him to retrieve a hidden item from the area surrounding the suspect's buttocks or genitals, is less invasive than a strip search and far less invasive than a body-cavity search. *See, Meeks v. City of Minneapolis*, 822 F. Supp. 2d 919, 923 (D. Minn. 2011) ("A public strip search of a suspect is more invasive than a 'reach-in' search performed when an officer reaches into a suspect's pants without disrobing him to retrieve a hidden item from the area surrounding the suspect's buttocks or genitals.") (citing *United States v. Williams*, 477 F.3d 974, 976, 977 (8th Cir.2007)).   Reach-in searches are not *per se* unreasonable, but, rather, are reasonable where the officer "take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy." *See, United States v. Gordon*, No. 2:04-CR-688, 2008 WL 3540007, at *4 (D. Utah Aug. 13, 2008) ("The court agrees with the Eighth Circuit that this type of reach-in search is permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy.  In this case, the search was conducted in the dark at 1:30 in the morning on the shoulder of the freeway on the passenger side of the car, where Gordon was shielded from public view. Under these circumstances the court finds that it would have been virtually impossible for members of the general public to have viewed the private areas of Gordon's body. Several courts have upheld similar searches.") (citations and internal quotation marks omitted); *Peroceski v. Tarr*, No. CIV.08-333(JRT/JJK), 2009 WL 3202463, at *9 (D. Minn. Sept. 30, 2009) ("[In *U.S. v. Williams*,] [t]he Eighth Circuit rejected a *per se* rule that 'when a detainee has been secured, and travel to a station house is possible, an on-street intimate inspection is an unconstitutional, unreasonable

search.' *Id*. at 977. The court held that a 'reach-in' search of a clothed suspect, which does not expose the suspect's genitals to onlookers, may be permissible if law enforcement officers take steps commensurate with the circumstances to diminish the potential invasion of the arrested person's privacy. *Id*. This is consistent with the other courts which have upheld reach-in searches of clothed suspects in a public setting. *See United States v. Ashley*, 37 F.3d 678, 682 (D.C.Cir.1994) (holding reasonable a search in which a police officer removed a bag of drugs from the suspect's underwear, where officer followed suspect from public bus station to the side of the station on the street outside, and stood in front of the suspect during the search); *State v. Jenkins*, 842 A.2d 1148, 1151, 1158 (Conn.App.Ct.2004) (holding that a reach-in search was reasonable where police searched a suspect on the side of a restaurant, out of public view, by pulling the suspect's pants and underwear away from suspect's body to retrieve drugs); *State v. Smith*, 464 S.E.2d 45, 46 (N.C.1995) (upholding a reach-in search on a public roadway where the officer used himself and a car door to shield the suspect from public view)").

In the instant case, Defendants performed the reach-in search of Plaintiff on the side of a country road on a dark winter night.  Plaintiff was standing on the passenger side of a patrol car that was parked on the shoulder of the road, and was thus shielded from the view of passing cars, of which there were not many.[49]  There were no civilian witnesses to the search, and the only female officer turned away during the search.  The search involved Clawson unbuckling Plaintiff's pants, pulling Plaintiff's undershorts away from his body and shining a flashlight onto Plaintiff's exposed crotch region.  The search inside Plaintiff's underwear was brief[50] and at most

---

[49] *See*, body-cam footage.

[50] "The search was conducted on the side of the road between the patrol car and the curb with plaintiff surrounded by three officers. It was 10:40 at night, the road was lightly travelled and there were no pedestrians in the area. Plaintiff was shielded from public view of passing vehicle traffic. No vehicles passed at the time Officer Clawson visually observed the inside of plaintiff's underwear. The entire search took approximately three minutes with but a few seconds of Officer Clawson visually observing down plaintiff's pants." Defs. Stmt. of Undisputed Facts, ECF No. 23-1 at ¶ 15.

involved some incidental contact between Clawson's gloved hand and Plaintiff's genitals. Plaintiff was released quickly after Clawson failed to find any drugs in Plaintiff's underwear.  On these undisputed facts that Court finds that the manner and scope of the search was reasonable.

For the reasons just discussed the Court finds that Defendants are entitled to summary judgment on Plaintiff's search claims based on probable cause.  Alternatively, the Court finds that even if probable cause was technically lacking, Defendants are nevertheless entitled to summary judgment based on qualified immunity[51] since there was at least arguable probable cause.  That is, based on the facts discussed earlier a reasonable officer in Defendants' place could have reasonably believed that probable cause existed.

The law in this regard applicable to qualified immunity based on arguable probable cause is well settled:

> An officer who lacks probable cause is entitled to qualified immunity if he or she can establish "arguable probable cause," which exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.

*Diamond v. O'Connor*, 347 F. App'x 676, 678, 2009 WL 3152099 at *2 (2d Cir. 2009) (citation omitted); *see also, Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) ("Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context.") (citations and internal quotation marks omitted).

---

[51] "A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (citations and internal quotation marks omitted).

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.  It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d at 202–03 (citations and internal quotation marks omitted)

> "Arguable" probable cause should not be misunderstood to mean "almost" probable cause. The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed. There should be no doubt that probable cause remains the relevant standard. If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.

*Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (citations omitted).  On summary judgment a "court must grant police officers qualified immunity when the court concludes that the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality of the [search or] seizure." *Cerrone v. Brown*, 246 F.3d at 203.

Where qualified immunity applies to a plaintiff's Section 1983 claim, it also applies to his analogous New York State law claims. *See, Jenkins v. City of New York*, 478 F.3d at 86–87 ("Qualified immunity protects an official from liability under federal causes of action but is not generally understood to protect officials from claims based on state law.  Nevertheless, a similar doctrine exists under New York common-law.   If the detective defendants were entitled to qualified immunity under federal law, summary judgment would be similarly appropriate on Jenkins' state law false arrest claim.") (footnotes omitted).

In the instant case the Court finds, based on all the facts and circumstances discussed above, that even if probable cause was lacking as to Plaintiff, police officers of reasonable

43

competence could nevertheless disagree as to whether such probable cause existed. *See,*
*Jenkins*, 478 F.3d at 87 ("An officer's determination is objectively reasonable if there was
"arguable" probable cause at the time of arrest—that is, if officers of reasonable competence
could disagree on whether the probable cause test was met.").  In particular, based on the
undisputed facts at least some officers of reasonable competence could agree that the totality
of the circumstances known at the time of the search provide a reasonable basis to believe that
all four men in the Mercedes were involved in drug dealing and that drugs would be found
concealed on Plaintiff's body.

<u>Defendants Are Entitled to Summary Judgment on the IIED</u>
<u>and NIED Claims</u>

Plaintiff's Fourth and Fifth Causes of action are for IIED and NIED, respectively.  The
factual allegations in support of these claims are essentially the same as those underlying the
false arrest/assault/battery/Fourth Amendment claims.[52]  Defendants have moved for summary
judgment as to all of Plaintiff's state-law claims, though the parties devote no discussion in their
papers to these particular claims.  Nevertheless, it is clear from the record, and particularly from
Plaintiff's deposition, that neither the IIED claim nor the NIED claim is legally viable.  For
example, with regard to the IIED claim, the record does not support the Amended Complaint's
bare and conclusory allegations of extreme or outrageous conduct or severe emotional
distress.[53] *See, e.g., Sullivan v. City of New York*, No. 17 CIV. 3779 (KPF), 2018 WL 3368706,
at *18 (S.D.N.Y. July 10, 2018) ("Even if the other allegations of misconduct could support claims
for false arrest, failure to intervene, and unreasonable search and seizure, they do not support
an IIED claim. Rather, the well-pleaded IIED allegations are co-extensive with the allegations

---

[52] Am. Compl. at ¶ ¶ 16–21.
[53] For example, as discussed earlier it is now undisputed in the record that the lone female officer, McCracken,
did not view the brief search inside Plaintiff's underwear, contrary to what the Amended Complaint asserts.

that give rise to Plaintiff's false-arrest claim. New York courts routinely dismiss IIED claims where they are duplicative of causes of action alleging false arrest and false imprisonment.") (citation and internal quotation marks omitted).  Similarly, the record does not support the Amended Complaint's bare "recitation of the elements" claim for NIED.  For example, the record does not indicate that Plaintiff suffered physical injury or threat of danger. *See, e.g., Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 298 (S.D.N.Y. 2015) ("Under New York law, a plaintiff may establish a claim for negligent infliction of emotional distress in one of two ways: (1) the bystander theory; or (2) the direct duty theory.  Both theories require physical injury or the threat of danger, either to the plaintiff [him]self or to a close family member.") (citation and internal quotation marks omitted).  Consequently, the Fourth and Fifth Causes of Action are dismissed.

> The Village of Brockport is Entitled to Summary Judgment
> on the Negligent Hiring, Retention, Training or Supervision Claim

Village of Brockport maintains that it is entitled to judgment on this claim since it is undisputed that the defendant officers were acting in the scope of their employment.  In response, Plaintiff indicates only that there are triable issues of fact as to whether the officers' actions were tortious, but does not challenge the contention that the officers were acting in the scope of their employment.

Plaintiff has essentially abandoned this point by failing to respond to Defendants' specific contention,[54] and in any event, the Court agrees with Defendants' argument.  In this regard, the Court has previously described New York law concerning negligent hiring, training and

---

[54] "A district court may, and generally will, deem a claim abandoned when a plaintiff [represented by counsel] fails to respond to a defendant's arguments that the claim should be dismissed." *Jennings v. Hunt Companies, Inc.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (collecting cases, citation and internal quotation marks omitted); *see also, Rugg v. City of New York*, No. 18 CIV. 9762 (LAP), 2019 WL 3242493, at *7 (S.D.N.Y. July 8, 2019) ("Plaintiff does not address his fifth and sixth causes of action in his response letter to the City's motion to dismiss, therefore the State and City hostile work environment claims are deemed abandoned.").

supervision, as being that

> where the acts of employees are concerned, an employer ... may be held directly liable for negligent hiring, retention, or supervision' for acts committed outside that scope.... [However, because an employer is vicariously liable for torts committed by an employee within the scope of his employment,] the only time a claim for negligent retention, training or supervision makes sense is when an employee tortiously injures someone while acting outside the scope of his employment, and the injured party cannot hold the employer vicariously liable in *respondeat superior* for the employee's tort, but may be able to hold the employer liable for its own negligence in retaining, training or supervising the employee.

*Ben v. United States*, 160 F. Supp. 3d 460, 476–77 (N.D.N.Y. 2016) (citations and internal quotation marks omitted) (Siragusa, J. as acting Judge of N.D.N.Y.); *accord, Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist.*, No. 16-CV-6594 (CJS), 2018 WL 2100605, at *27 (W.D.N.Y. May 7, 2018) (quoting *Ben v. United States*).  Here, Plaintiff has not demonstrated the existence of any triable issue of fact as to whether the officers were acting within the scope of their employment, and consequently the Sixth Cause of Action is dismissed.

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 23) is granted in part and denied in part, as follows: The application is denied insofar as it is directed at those portions of the First, Second, Third and Seventh Causes of Action that are based on the seizure of Plaintiff prior to the search, but is otherwise granted.  More specifically, Defendants are entitled to judgment on the following claims: Those portions of the First, Second, Third and Seventh Causes of Action that are based on the search of Plaintiff's person, as well as the entire Fourth, Fifth and Sixth Causes of Action.  For the sake of judicial economy, to the extent that Defendants may wish to file a further summary judgment motion against the remaining portions of the First, Second, Third and Seventh Causes of Action that are based on the seizure prior to the search, Defendants must file and serve such motion within thirty (30) days of the date of this Decision and Order.

Plaintiff shall then have thirty (30) days to file any response, and Defendants shall have fifteen (15) days to file and serve any reply.  If no such motion is filed the Court will schedule a pretrial conference.

        SO ORDERED.

Dated:      Rochester, New York
              February  28, 2022

                        ENTER:

                        CHARLES J. SIRAGUSA
                        United States District Judge