UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEREMY J. SMITH,

                              Plaintiff

-vs-

THE VILLAGE OF BROCKPORT,
ZACHARY WAKEFIELD, CHRISTOPHER
CLAWSON and KELLY McCRACKEN, each
in his or her official and individual capacity,

                              Defendants

_____

                                        DECISION AND ORDER

                                        19-CV-6404 CJS

## INTRODUCTION

Plaintiff commenced this action asserting state-law claims, for false arrest, false imprisonment, assault, battery, intentional and negligent infliction of emotional distress, and negligent hiring, retention and supervision, and federal claims under 42 U.S.C. § 1983, for violations of his rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution, arising from what he maintained was an illegal seizure and search of his person during a narcotics investigation following a traffic stop of a vehicle in which he was a passenger.  The Court granted summary judgment to Defendants on all claims except portions of the First, Second, Third, and Seventh Causes of action, that turn upon whether Plaintiff was illegally seized prior to the search, when he was handcuffed and placed in a patrol car by a non-party police officer for approximately thirty minutes, and, if so, whether Defendants unreasonably failed to intervene.  Now before the Court is Defendants' motion for summary judgment on the remaining claims, ECF No. 29.  For reasons discussed below the application is granted.

1

BACKGROUND

The reader is presumed to be familiar with the Court's prior Decision and Order in this action, ECF No. 28.  Briefly, this action arises from a traffic stop that occurred on the bitterly-cold night of December 29, 2017, at 10:40 p.m., near the State University of New York at Brockport ("SUNY").  More specifically, the traffic stop took place near the intersection of Redman Road and New Campus Drive, which is a rural section of road on the outskirts of the SUNY campus and remote from any campus buildings or residences.[1]

At that time, non-defendant SUNY Police Officer Petritz ("Petritz") stopped a Mercedes sedan for speeding, after he observed it traveling 55 miles per hour in a 40-mile-per-hour zone.[2]  The sedan had four occupants: The driver, Dyshieka McFadden ("Dyshieka"); the front seat passenger, Dyshieka's brother, Nazier McFadden ("Nazier"); and the two backseat passengers, Jordan Holland ("Holland") and Plaintiff, Jeremy Smith ("Plaintiff" or "Smith").

Upon walking up to the stopped Mercedes, Officer Petritz observed that the four men were moving around inside the vehicle.[3]  Additionally, upon initially speaking to Dyshieka, Petritz perceived a strong odor of burned marijuana, and remarked that "the car smelled like weed."[4]  In response to Petritz's requests, Dyshieka was unable to produce a driver's license, other identification, or vehicle registration.[5]

Petritz placed a radio call for additional police assistance, and three officers from the Village of Brockport Police Department, namely, defendant Officers Clawson,

---

[1] ECF No. 23-12 at p. 10.
[2] ECF No. 23-12 at p. 10.
[3] *See*, Body-worn camera footage.
[4] 50-h Hearing, ECF No. 23-5 at p. 19.
[5] 50-h Hearing, ECF No. 23-5 at pp. 19–20.

McCracken and Wakefield, arrived at the scene in separate patrol cars.  Clawson, McCracken, and Wakefield each wore body cameras which were filming during the interaction.  The body camera footage is part of the record, and the Cout relies heavily on it in setting forth the facts below.

When Clawson, McCracken and Wakefield arrived at the scene as backup, Petritz informed them that he had stopped the Mercedes for speeding, that the vehicle also had improperly tinted windows, and that the interior of the car smelled strongly of burnt marijuana.[6]  The officers then began removing the four occupants from the vehicle, beginning with the driver, Dyshieka.

Petritz removed Dyshieka from the car and patted him down, while again commenting that the car smelled strongly of marijuana.  Petritz asked Dyshieka why he and his passengers had been reaching around in the vehicle after it was stopped, and Dyshieka responded that they had been looking for his "vehicle registration book" which he claimed was "in the back seat somewhere."[7]  However, no such registration or book was ever found by the officers during a subsequent search of the car.  Petritz then stated that he had seen marijuana blunts in the vehicle's ashtray and asked if the men had been smoking marijuana, which Dyshieka admitted was true, though he indicated that it had been "way earlier" in the day.  Dyshieka also admitted that he was on probation.  Petritz then insisted that Dyshieka smelled very strongly of marijuana, as if he had "just smoked" a few minutes earlier, and Dyshieka admitted that he had "just smoked."  Petritz's pat-down of Dyshieka discovered a large amount of cash ($6,300) in small bills. When Petritz asked Dyshieka why he was carrying that much money, Dyshieka asserted that he

---

[6] *See, e.g.*, ECF No. 23-12 at p. 11 ("Petritz detected an overpowering smell of burnt marijuana.").
[7] Wakefield body-worn camera footage.

worked delivering newspapers and had just received his Christmas bonus. Petritz then handcuffed Dyshieka and placed him in a patrol car.[8]

Wakefield then removed Holland from the car and patted him down. Holland asked why he was being frisked, and Wakefield stated it was because "there was weed in the car."[9]  Wakefield asked Holland what he and the others were doing and to where they were headed, to which Holland vaguely responded that they were dropping someone off, although he did not know where. Wakefield then asked Holland whether there was marijuana in the car, and Holland insisted that he knew nothing about marijuana, and further denied that the car smelled of marijuana, even though Dyshieka had already admitted to Petritz that the men had been smoking marijuana just prior to the traffic stop. However, Wakefield's frisk of Holland found no contraband, and Wakefield consequently placed Holland, unhandcuffed, into the back of his patrol car. Wakefield then got into the patrol car and ran a computer records check on Holland.

While Wakefield was thus occupied with Holland, Petritz, Clawson, and McCracken began to search the remaining two occupants of the Mercedes, Nazier and Plaintiff. In that regard, Petritz took Plaintiff on one side of a patrol car, while McCracken took Nazier on the other side of the same patrol car, and Clawson stood at the front of the vehicle with a flashlight, in the role of "cover officer"[10]  In that role, Clawson alternated shining his flashlight between the two individuals being searched.

As can be seen from Clawson's body camera footage,  Petritz performed the pat-down of Plaintiff and removed numerous items from Plaintiff's pockets, which he placed

---

[8] Wakefield body-worn camera footage.
[9] Body-worn camera footage.
[10] Clawson Deposition at p. 26.

4

on the hood of the patrol car. One such item was a "dime bag" containing marijuana residue.[11]   However, Petritz, who collected all the evidence at the scene, did not announce to Clawson or McCracken what he had found during the search.

Meanwhile, McCracken found approximately $800 in Nazier's pocket, which prompted Clawson to begin asking Nazier why he was carrying that much cash.

Upon completing his frisk of Plaintiff, Petritz stated to him, "Right now you're just being detained," whereupon he started to place Plaintiff in handcuffs.

Simultaneously with this, Clawson began searching Nazier, while held Nazier's arm.  Clawson observed that Nazier "reeked of weed," and Nazier agreed that he was carrying marijuana.  Nazier stated that he had a "dime" in his coat pocket, and that he had been preparing to smoke a blunt just prior to the traffic stop.  As this exchange was occurring, it can be seen in the background of Clawson's body camera footage that Plaintiff and Petritz are still standing at the hood of the patrol car, where Petritz had been frisking Plaintiff.  Shortly thereafter, Petritz, who is off camera, can be heard asking Clawson whether he can place Plaintiff in the back of Clawson's patrol car, to which Clawson responds in the affirmative while continuing to search Nazier.

As Clawson began to search Nazier's coat pockets, McCracken, who was holding Nazier's arm, commented to Clawson that Nazier was trying to pull away from her, and that she suspected that he might have even more contraband on his body than he was admitting.

---

[11] As Plaintiff is being searched by Petritz he can be heard on Clawson's body camera referring to a "dime bag," and later, during second search of Plaintiff's body, he acknowledged to Clawson that he had an empty dime bag containing marijuana residue.  At that same time, Petritz commented that Plaintiff could possibly be charged related to the marijuana residue. *See*, prior Decision and Order, ECF No. 28 at p. 7 ("During the search of his clothing Plaintiff admitted that he had an empty "dime bag" of marijuana in his pocket. Officer Petritz commented that the bag contained marijuana "residue" for which Plaintiff might be charged, and Plaintiff expressed doubt that he could be charged merely for having residue.").

At about this time, Wakefield, who had been working inside his patrol car the entire time that Plaintiff was being searched by Petritz, passed by the other officers on his way to search the interior of the Mercedes.  Wakefield then conducted a detailed search of the Mercedes that lasted approximately fifteen minutes.

Meanwhile, Clawson searched but found no marijuana in Nazier's coat, contrary to Nazier's assertion that the marijuana was located there.  Nazier then stated that the marijuana was actually in his shoe.  However, Clawson searched Nazier's shoes and again found nothing.  Clawson then announced that he was going to conduct a full search of Nazier's person, at which point Nazier admitted that he had marijuana hidden in his underwear.  Clawson then retrieved 21.5 grams of marijuana, wrapped in thirteen separate plastic bags, from inside Nazier's underpants.  Clawson remarked that, based on the amount of cash and marijuana Nazier was carrying, he must be a dealer, but Nazier denied it, insisting that he smoked a lot of marijuana and had just purchased his supplier's entire stock.  When asked who his supplier was, Nazier stated that he bought the marijuana from "a white kid named Sam."  When asked where the purchase took place, Nazier indicated that he would not say unless his handcuffs were removed.

After finding the marijuana in Nazier's underwear, the officers decided to re-frisk the other three occupants of the Mercedes in a more-thorough fashion, on the theory that they also might have drugs concealed in their underwear.  The officers then conducted repeat searches of Dyshieka, Holland and Plaintiff, starting with Dyshieka.

Clawson first asked Dyshieka if he had drugs concealed on him, which Dyshieka denied.  Dyshieka further indicated that he would not possess drugs since he was on probation, and, further, that he had been unaware that his brother was carrying marijuana.

Clawson told Dyshieka that despite what Dyshieka was telling him, the story was "not adding up."  However, Dyshieka insisted that the cash he possessed was from his job delivering newspapers and that he did not have any narcotics on his body.  However, upon shining a light into Dyshieka's underwear, Clawson spotted a bag containing what appeared to be crack cocaine.  Dyshieka nevertheless insisted that he was not involved with drugs and had no idea how how the cocaine came to be located in his pants.

The officers then re-searched Holland and Plaintiff more thoroughly, but found no no contraband.  Wakefield also found no additional contraband inside the Mercedes.

The officers eventually charged Dyshieka and Nazier, related to their possession of cocaine and marijuana, respectively, but released Plaintiff and Holland. [12]  The time-stamped body camera footage indicates that Plaintiff was handcuffed in the patrol car for approximately thirty minutes before being released.[13]

Plaintiff commenced a civil action against Defendants in New York State Supreme Court, Monroe County.  On May 31, 2019, Defendants removed the action to this Court.  On September 30, 2019, Plaintiff filed the operative Amended Complaint, ECF No. 11, purporting to assert tort claims under New York State Law as well as claims under 42 U.S.C. § 1983 ("Section 1983").  More specifically, the Amended Complaint asserted the following seven claims: 1) state law cause of action for false arrest and false imprisonment; 2)  state law cause of action for assault; 3) state law cause of action for battery; 4) state law cause of action for intentional infliction of emotional distress ("IIED");

---

[12] 50-h Hearing, ECF No. 23-5 at p. 30.  After searching the car once and the men twice, the officers also called in a K-9 drug-sniffing dog, but, again, no contraband was found in the car. Pl. Deposition, ECF No. 23-5 at pp. 37–38 (K-9 dog).

[13] Also, at his deposition, Plaintiff testified that he was handcuffed in the patrol car for "thirty to forty minutes maybe." Pl. Deposition at p. 30.  Plaintiff later indicated that he was actually handcuffed for almost an hour, *see, id.* at p. 41, but that testimony is refuted by the body camera footage.

5) state law cause of action for negligent infliction of emotional distress ("NIED"); 6) state law cause of action for negligent hiring, retention, training or supervision; and 7) Section 1983 cause of action for violation of Plaintiff's federal rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.  Plaintiff did not sue Petritz, nor did he expressly assert any claim against Defendants for failing to intervene in any unconstitutional conduct by Petritz.

On September 30, 2020, Defendants filed a Motion for Summary Judgment (ECF No. 23) as to all claims.  On February 28, 2022, the Court issued a Decision and Order (ECF No. 28) granting summary judgment for Defendants on most of Plaintiff's claims.  In that regard, the Court found, *inter alia*, that probable cause had been established as to Plaintiff during the course of the traffic stop, stating:

> [T]he Court finds that the facts known to Defendants objectively established probable cause to believe that Plaintiff was involved in the possession and/or sale of narcotics and that evidence of such criminal activity was hidden on his body. In particular, the following facts were known to the officers: Plaintiff and the other three occupants of the Mercedes were traveling together in a relatively small sedan; the four occupants were long-time associates, who had known each other since middle school; after the sedan was stopped for speeding the men began moving around suspiciously in the vehicle, and when asked why they had been doing so, Dyshieka offered an explanation that was later shown to be untrue; the occupants offered only a vague explanation for where they were going; the automobile and the occupants reeked of marijuana smoke; there were smoked marijuana blunts in the ashtray located in the console between the two front seats; Dyshieka admitted having "just smoked" marijuana, despite being on probation; Nazier admitted that he had been preparing to smoke a blunt when the car was pulled over for speeding; despite the obvious signs of marijuana having been recently smoked in the car, the supply of such marijuana was not found in the car itself; despite the obvious evidence of marijuana having just been smoked in the sedan, Holland implausibly denied either that he knew anything about marijuana or that the car smelled of marijuana; Dyshieka was carrying over six thousand dollars in cash and

implausibly indicated that the money was a Christmas bonus from his job delivering newspapers; Nazier was carrying eight hundred dollars in cash and had twenty-three bags of marijuana concealed in his underwear, and when asked why, indicated implausibly that he had just purchased his drug supplier's entire stock of marijuana for his own use; Dyshieka had crack cocaine concealed in his underwear and claimed he had no idea how it got there; and when asked about Dyshieka and Nazier, Plaintiff denied that they sold drugs and implausibly explained that they were carry large sums of money because they did not use banks and were "stingy" in that they saved all the money they earned.

Here, . . . the quantity of drugs and cash in the car, along with other facts just enumerated, made it reasonable for Defendants to infer a common enterprise, namely, drug dealing, among the four men.

Decision and Order, ECF No. 28 at pp. 35-36.  The Court therefore found that the full search of Plaintiff's body, including the "reach in" search of Plaintiff's underwear, was reasonable under the Fourth Amendment.

However, the Court declined to grant summary judgment as to those portions of the First, Second, Third and Seventh Causes of Action that were based on Petritz's seizure of Plaintiff prior to the search, referring to the period of time during which Plaintiff was handcuffed in the patrol car before probable cause was developed.

Notably, the Court declined to grant summary judgment as to those claims not because it found Plaintiff had raised a triable issue of fact, but because it found that neither party had briefed the relevant issues, and that it would have been improper for the Court to address them *sua sponte*.  In doing so, the Court observed that even though Plaintiff had neither sued Petritz nor expressly asserted a failure-to-intervene claim, it appeared he was attempting to raise such a claim against Defendants.  In particular, the Court stated, in pertinent part:

Defendants initially note that it was [non-party] Petritz, and not they, who

decided to stop and detain the men, though they do not dispute that Petritz's decision in that regard was appropriate.  <u>The motion, though, does not attempt to address whether it was appropriate, based on the state of facts known at the time, for Petritz to detain Plaintiff, by handcuffing him and placing him in a patrol car</u>.  Rather, Defendants' motion is focused only on the legality of the second, more-thorough, search of Plaintiff by Clawson, which took place thirty or forty minutes after Plaintiff was detained. Defendants maintain that if such *search* was legal then all of Plaintiff's claims fail.

***

[However,] Plaintiff disputes Defendants' contention that his claims rise or fall based entirely on the legality of the search by Clawson.  Instead, Plaintiff concedes only that the traffic stop and initial pat-down were justified, and disputes the legality of everything that followed, namely, the handcuffing, placement in the police car and search.[14]   More specifically, the Court understands that Plaintiff is challenging the legality of the <u>handcuffing, detention in the police cruiser</u>, and search of his body and clothing, which took place even though the initial pat-down gave no indication that he was carrying weapons or contraband.[15]   <u>Plaintiff, though, does not go beyond the scope of Defendants' motion and offer a legal argument for why the handcuffing and detention were unlawful</u>, but, instead, responds only to Defendants' arguments concerning the search by Clawson.

***

[P]ersonal involvement is a prerequisite for liability under Section 1983, and a police officer is not personally involved in an allege constitutional violation merely because he is present at the scene of an arrest.[16]   However, in actions such as this involving multiple police-officer defendants, a defendant officer may be personally involved either because he directly violated the plaintiff's rights <u>or because he failed to intervene</u> to prevent another officer from violating such rights.[17]

---

[14] ECF No. 26 at p. 1 (Summarizing Plaintiff's argument as being that, "assuming *arguendo* the initial pat-down search of plaintiff was lawful, the handcuffing, detention, second pat-down, and the visual cavity search of Plaintiff's groin were not.").

[15] *See*, Pl. Mem. of Law, ECF No. 26 at p. 10 ("Once Ofc. Petritz patted down Plaintiff, emptied his pockets and found nothing, there was no lawful reason to search Plaintiff further.").

[16] *See, Snead v. City of New York*, 463 F. Supp. 3d 386, 398 (S.D.N.Y. 2020) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.  An officer's mere presence at the scene of a stop or arrest generally does not constitute sufficient personal involvement for § 1983 liability.") (citation and internal quotation marks omitted, collecting cases), *reconsideration denied sub nom. Snead v. LoBianco*, No. 16-CV-09528 (AJN), 2021 WL 861060 (S.D.N.Y. Mar. 8, 2021).

[17] *See, e.g., Harris v. City of New York*, No. 15-CV-8456 (CM), 2017 WL 6501912, at *3 (S.D.N.Y. Dec. 15, 2017) ("To be held liable under § 1983 for false arrest or failure to intervene, an officer must be

10

***

In this action, Defendants were clearly present when Petritz handcuffed Plaintiff and placed him in the patrol car, and were privy to the same information as Petritz, since Petritz had told them what he had observed during the traffic stop that made him think further investigation was warranted.  Consequently, the fact that Plaintiff was handcuffed and placed in the police cruiser by Petritz does not end the inquiry into his seizure claim against Defendants.

The Fourth Amendment protects persons from unreasonable seizures, including but not limited to arrests without probable cause. *See, Williams v. City of New York*, 683 F. App'x 57, 58 (2d Cir. 2017) (Indicating that claims for false arrest under section 1983 rest "on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause.") (citation omitted).   Indeed, the Fourth Amendment requires that "[b]efore [a police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *United States v. Vasquez*, 638 F.2d 507, 520 (2d Cir. 1980) (citation omitted).

> "[T]he first step in any Fourth Amendment claim (or, as in this case, any section 1983 claim predicated on the Fourth Amendment) is to determine whether there has been a constitutionally cognizable seizure." *Medeiros v. O'Connell*, 150 F.3d 164, 167 (2d Cir. 1998). A Fourth Amendment "seizure" occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not at liberty to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. However, "mere police questioning does not constitute a seizure." *Muehler v. Mena*, 544 U.S. 93, 101 (2005) (internal quotation omitted).

---

"personally involved" in an unlawful arrest.  An officer can be personally involved in one of two ways: He can directly participate in the arrest, or he can fail to intervene to stop an unlawful arrest when the evidence establishes that he would have been able to do so.") (citations omitted).

If there was a seizure, the Court proceeds to the second step, which is to determine what type of seizure occurred. There are two relevant types of seizures, each of which requires a different level of justification: (i) an investigatory (or *Terry*) stop, which must be based on "a reasonable suspicion supported by articulable facts that criminal activity may be afoot"; and (ii) an arrest, which must be based on probable cause. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Whether a seizure is an arrest or a merely an investigatory detention, depends on the reasonableness of the level of intrusion under the totality of the circumstances." *Posr v. Doherty*, 944 F.2d [91,] 98 [(2d Cir. 1991)] (internal citations omitted). "As the level of intrusiveness rises, ... an encounter between the police and a citizen is more properly categorized as an arrest." *Id*.

"A permissible investigative stop may become an unlawful arrest if the means of detention are more intrusive than necessary." *United States v. Wiggan*, 530 F. App'x 51, 55 (2d Cir. 2013) (summary order) (internal quotation omitted). Thus:

In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

*Id*. (internal citation omitted).

***

The third and final step is to determine whether the seizure was justified—in other words, whether the officers had reasonable suspicion (if the seizure was an investigatory stop) or probable cause (if the seizure was an arrest). *See Posr v. Doherty*, 944 F.2d at 98. In reviewing whether the officers had reasonable suspicion, "courts evaluate the circumstances surrounding the stop through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (internal quotation omitted). "Even

conduct that is as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity." *Id*. (internal quotation omitted).

In contrast, probable cause exists if an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation omitted). "Probable cause does not require absolute certainty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). Indeed, "some exculpatory evidence does not make an arrest illegal when the totality of evidence still establishes probable cause to believe that the suspect committed the crime." *Stansbury v. Wertman*, 721 F.3d 84, 94 (2d Cir. 2013).

*McKenzie v. City of Mount Vernon, et al.*, No. 18 CV 603 (VB), 2018 WL 6831157, at *3-4 (S.D.N.Y. Dec. 28, 2018).

It is not disputed here that the odor of marijuana gave Defendants probable cause to search the Mercedes. *See, e.g., United States v. Holt*, No. 3:21-CR-80 (MPS), 2021 WL 5281366, at *6 (D. Conn. Nov. 12, 2021) ("The Second Circuit has recently held that the odor of marijuana, combined with a defendant's statement that he had been smoking marijuana earlier, justified a search of the defendant's vehicle. *United States v. Goolsby*, 820 F. App'x 47, 49 (2d Cir. 2020) (summary order), *cert. denied* 141 S. Ct. 2818 (2021). And numerous district courts within this Circuit have held, also recently, that the odor of marijuana alone provides probable cause.") (collecting cases). Nor does Plaintiff dispute, for purposes of this Decision and Order, that Defendants were entitled to order him from the vehicle and pat him down.  The issue, rather, is whether, after finding nothing during the pat down, [Petritz was] entitled to seize Plaintiff by handcuffing him and placing him in the back of a patrol car while [the officers] conducted the automobile search and/or otherwise continued their investigation.

Of course, "[d]uring a *Terry*[18] stop, police may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Gray v. Nordstrom*, No. 3:18CV1402 (KAD), 2020 WL 5709632, at *3 (D. Conn. Sept. 24, 2020) (citation omitted).

---

[18] *Terry v. Ohio*, 392 U.S. 1 (1968).

Moreover, in connection with a valid traffic stop, the odor of marijuana emanating from a vehicle provides reasonable suspicion of legal wrongdoing and justifies officers in continuing the detention of the vehicle's occupants pending further investigation. *See, United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) ("As the officers approached the SUV, they immediately detected an independent basis [(the odor of marijuana)] for continuing to detain the SUV and its occupants. . . . The officers then had a particularized and objective basis for suspecting legal wrongdoing, and were justified in continuing the detention of the SUV and its occupants.") (citations and internal quotation marks omitted); *see also, United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at *5 (D. Conn. July 24, 2018) ("Detective Pontz was close enough to the vehicle to form a reasonable suspicion that the occupants had recently been smoking marijuana. Thus, the smell of marijuana provided an independent basis for continuing to detain the vehicle and its occupants.") (citing *Jenkins*).

However, during such an investigatory *Terry* detention, officers are not automatically entitled to handcuff a detainee and place him in a patrol car. *See, United States v. Mack*, No. 17-CR-6159-EAW-JWF, 2018 WL 8898465, at *6 (W.D.N.Y. Nov. 29, 2018) ("[A]n officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is 'armed and dangerous.'") (citation omitted).[19]   More specifically, and as alluded to earlier, the applicable legal principles on this point are well settled:

> For an investigatory stop to be conducted in an "appropriate manner," *Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. 1868, the stop must be "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place," *Grice v. McVeigh*, 873 F.3d at 167; *see also United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993) (stating that permissible *Terry* stop may ripen into *de facto* arrest requiring probable cause if officers "unreasonably used means of detention that were more intrusive than necessary" for stop). Factors generally relevant to that inquiry include the following: (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person

---

[19] *Report and recommendation adopted*, No. 6:17-CR-06159 EAW, 2019 WL 2590741 (W.D.N.Y. June 25, 2019), aff'd, No. 20-376-CR, 2021 WL 4851391 (2d Cir. Oct. 19, 2021).

stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Patterson*, No. 19-4332-CR, --- F.4th--- , 2022 WL 333248, at *10 (2d Cir. Feb. 4, 2022) (citation and internal quotation marks omitted). "No one of these factors is determinative. But to satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means reasonably available to effect their legitimate investigative purposes." *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (citation omitted). On this point, "it is the Government's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id*.

Here, the Court understands Plaintiff to be arguing that while the traffic stop and initial pat down may have been permissible, the *Terry* stop ripened into a *de facto* arrest unsupported by probable cause when [Petritz] handcuffed him and placed him in the back of a patrol car[.] . . . Defendants, on the other hand, argue that probable cause existed at the time of the [second] search of Plaintiff's person, but do not discuss why, prior to such search, it was reasonable for Plaintiff to be handcuffed and placed in the rear of a patrol car. For example, there is no indication in the record that Defendants suspected Plaintiff of possessing a weapon or of otherwise posing a threat to their safety. Nor do Defendants otherwise attempt to argue that the *Terry* stop was conducted in an appropriate manner considering the factors set forth above.

Defendants may ultimately be able to show that the investigatory detention of Plaintiff was reasonable under the Fourth Amendment, but at this time they have not attempted to do so. Nor does the Court believe that it would be appropriate in this case to analyze the issue *sua sponte*. Consequently, Defendants' motion is denied insofar as it is directed at the causes of action arising from the [*Terry*] detention/seizure of Plaintiff.

Decision and Order, ECF No. 28 (emphasis added).

Before proceeding further, the Court emphasizes that, as can be seen from the above-quoted portions of the prior Decision and Order, the Court did *not* find that a triable issue of fact existed as to whether Petritz's investigatory detention of Plaintiff was

reasonable, nor did it find that if such detention was unreasonable, Defendants would be liable for failing to intervene to stop Petritz from violating Plaintiff's Fourth Amendment rights.   Rather, the Court merely pointed out that it could not decide those issues on the record before it, and that Defendants would need to file a supplemental motion addressing those points. *See*, Decision and Order, ECF No. 28 at pp. 46-47 ("For the sake of judicial economy, to the extent that Defendants may wish to file a further summary judgment motion against the remaining portions of the First, Second, Third and Seventh Causes of Action that are based on the seizure prior to the search, Defendants must file and serve such motion within thirty (30) days of the date of this Decision and Order.").

Defendants accepted the Court's invitation and filed the subject supplementary motion for summary judgment (ECF No. 29) concerning their potential liability for Petritz's seizure of Plaintiff prior to the search.  Defendants' supporting memorandum essentially argues that even assuming *arguendo* that Petritz acted unreasonably by handcuffing Plaintiff and placing him in a patrol car while the investigation was ongoing, Defendants cannot be liable since they had no reasonable opportunity, during the brief period that Plaintiff was detained, either to know what Petritz was doing, or to intervene.  *See, e.g.*, Defs. Memo of Law, ECF No. 29-1 at p. 5 ("[T]hey had no duty to intervene in the first instance as they were unaware of any constitutional violation.  Further, even if they were, no reasonable juror could conclude that they had sufficient time or opportunity to intervene given all that was occurring on the scene.").  As will be discussed further below, Defendants' motion is supported by additional affidavits from Clawson, Wakefield, and McCracken, in which they essentially maintain that they were not aware that Petritz had handcuffed Plaintiff, and, in any event, that they did not have a reasonable opportunity to

intervene since they were actively occupied with other aspects of the investigation.

Plaintiff responds by seemingly arguing, first, that the Court should treat it as an established fact that his rights were violated: "Firstly, it should be highlighted that defendants do not argue that Plaintiff's constitutional rights were not violated.   They simply argue that it was not the Brockport officers who violated them."[20]   Next, Plaintiff argues that Defendants directly violated his Fourth Amendment rights by cooperating with Petritz in the detention, rather than by merely failing to intervene and stop Petritz.   On this point, Plaintiff contends, for example, that although Petritz was a SUNY officer, he placed Plaintiff into a Village of Brockport police cruiser.   Alternatively, Plaintiff further contends that, assuming Petritz violated his rights, there are triable issues of fact as to whether Defendants were aware of such violation and failed to intervene.   More specifically, Plaintiff first states that there are triable issues of fact as to whether Defendants knew that Petritiz had placed him in handcuffs:

> [Officer Clawson's body-camera footage] "shows Officer Petritz searching and patting down Plaintiff, emptying his pockets and then handcuffing him. It also shows that no contraband was discovered on Plaintiff's person. Obviously, then, Officer Clawson was in the immediate vicinity and personally witnessed the seizure at issue.   Furthermore, at various times while Plaintiff was detained in the cruiser, all three Brockport officers were in immediate proximity of the cruiser and would have witnessed Plaintiff's detention.

Pl. Memo of Law, ECF No. 32, at p. 4.   Plaintiff further contends that there are triable issues of fact as to whether Defendants had a reasonable opportunity to intervene in some way. *See, e.g., id*. at p. 5 ("[D]efendants' argument strains credulity.   Officers Clawson and McCracken were clearly in a position to intervene at various points while

---

[20] Pl. Reply Memo at p. 3.

Plaintiff was detained[.]").  Plaintiff, though, has not submitted any affidavits or other additional evidence in opposition to Defendants' motion.  Instead, Plaintiff relies on what he maintains is shown by the body-camera footage.

In their Reply, Defendants emphasize, first, that they are not conceding that Petritz violated Plaintiff's Fourth Amendment rights merely by handcuffing him and placing him in a patrol car, even assuming that Petritz's frisk of Plaintiff found no weapon or contraband.  Rather, Defendants state that Petritz acted reasonably under the circumstances, stating, in pertinent part:

> The initial detention of plaintiff was clearly justified as a *Terry* stop as recognized by this court in its earlier decision. (ECF Doc. No. 28 p. 24-25) The question is whether the *Terry* stop ripened into a *de facto* arrest. The defendants recognize that "handcuffing is ordinarily not incident to a *Terry* stop and tends to show that a stop has ripened into an arrest." *Grice v McVeigh*, 673 F.3d 162, 167 (2d Cir. 2017). Notably, the *Grice* court recognized, however, that "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest" in certain circumstances. *Id* @ 168.  Indeed after the *Grice* decision, the Second Circuit has held under remarkably similar circumstances that the handcuffing of an individual on a *Terry* stop after that individual had been patted down and no weapons or contraband was revealed, did not constitute an arrest or Fourth Amendment violation. *United States v Fiseku,* 906 F.3d 65 (2d Cir 2018).
>
> In *Fiseku*, the plaintiff was in the vicinity of a vehicle which had been previously identified as being stopped due to mechanical difficulty, but thereafter moved to the vicinity of a home that was empty but for sale, which the investigating officer considered a prime target for burglary. The police officer, having observed the vehicle now at another location and the plaintiff *Fiseku* roaming around the area of the vehicle, again stopped the vehicle and began questioning the plaintiff. [Fiseku] provided a license and was patted down for weapons and contraband and none was found. The officer decided in the interests of safety to handcuff plaintiff Fiseku as he continued his investigation. Two other officers were present. The Second Circuit, heeding the Supreme Court's warning not to "indulge in unrealistic second-guessing" [and] citing *United States v Sharpe* 470 U.S. 675, 686, 105 S. Ct.

1568, 84 L. Ed. 2d 605 (1985), held that handcuffing was a less intrusive means than holding plaintiff Fiseku at gunpoint and determined that no constitutional violation occurred and the *Terry* stop did not become a *de facto* arrest.

The officer in *Fiseku* did not even observe a traffic violation: he simply observed suspicious activity and had a suspicious vehicle which Fiseku was not even in, but was walking near it. Fiseku produced a license identifying himself and was patted down, but no contraband or weapons found. He was handcuffed by the officer purportedly for his safety as the individuals in the vehicle were to be questioned and there were two other officers present. Both Fiseku and the other individuals in the car were handcuffed, even though no violation or crime was then known to have been committed. Yet, the court found handcuffing during this investigation of suspicious activity was justified and did not violate plaintiff's constitutional rights.

Here, the circumstances are even more "unusual" than in *Fiseku* justifying Petritz['s] handcuffing and placement of Smith in the patrol vehicle. While there was no violation or crime known to have been committed in *Fiseku*, here Petritz had the following circumstances known to him before Smith was handcuffed and detained in the police vehicle:

- It was 10:30 p.m. on a dark road in rural Brockport N.Y. but in the vicinity of SUNY Brockport;

- a 2008 Mercedes Benz was observed travelling at a high rate of speed;

- the officer stopped the vehicle and observed illegally tinted front and rear windows;

- the driver had no license or identification nor did two of the three passengers;

- the vehicle had an overpowering smell of burnt marijuana;

- Officer Petritz was concerned for his safety, requesting back up from Brockport P.D.

- all individuals in the vehicle denied having contraband in the vehicle, but the driver acknowledged smoking marijuana in the vehicle earlier and showed the officer marijuana "roaches" in the ash tray;

- upon a safety pat down of the driver who the officer decided to detain, he recovered $6,333 in cash and believed it was consistent with narcotics sales;

- although the front passenger denied having any contraband,[21] a pat frisk of him found 21.5 grams of marijuana concealed in the groin area of the underwear wrapped in 13 separate plastic baggies, also consistent with drug sales as well as $834 in U.S. currency;

- the individuals in the vehicle indicated they were from the City of Rochester but had no clear explanation of where they were going or what they were doing;

- at this time a more thorough search of the driver revealed he was in possession of a bag of cocaine, also secreted in the groin area of his underwear;

Upon that background, Officer Petritz elected to handcuff the plaintiff before placing him in a police car while the officers at the scene further investigated the other individuals. Given the fact that the first two individuals searched were clearly secreting drugs in the groin area of their underwear necessitating a more thorough search, the fact that they lied to the police about the contraband, the indicia that they were drug dealers in the area of a college, without identification driving a car with blacked out windows and no place to go, Officer Petritz reasonably placed plaintiff in the police car handcuffed for purposes of officer safety and so as to prevent him from removing and discarding potential contraband while the officers were investigating to the other individuals as well as for safety purposes. It would be reasonable to assume that since the other individuals were secreting drugs in their underwear that so too was Mr. Smith. Hence placing him in the police vehicle unattended and without handcuffs would have provided him the opportunity to discard any illegal drugs he might be secreting, not to mention the safety concerns raised by the fact that there were four individuals, known unlawful activity, and indicia that they were selling drugs raising heightened concern for officer safety.

Accordingly, the defendants maintain in the first instance that the detention of the plaintiff in the police vehicle for 27 minutes while handcuffed as the police attended to the other three occupants of the vehicle, did not turn the

---

[21] Plaintiff is actually mistaken on this point, as Nazier admitted that he was carrying marijuana. However, Nazier lied at least twice concerning the location of the drugs before they were found in his underwear.

*Terry* stop into an arrest. Notably, in *Grice*, the second circuit held that holding the plaintiff in handcuffs for thirty minutes while an investigation by another police agency was finished was not an unreasonable interval. *Grice* @ 168. Again, the situation confronted in *Grice* was seemingly of considerably less suspicion and danger than the instant case: *Grice* involved a 16 year old lawfully observing trains go by when his activity was reported as suspicious. He actually had a letter from the railroad indicating his activity was permitted, though the police did not initially look at it as they were concerned about the situation. Moreover, there were "several other" police officers on scene.

Again, the circumstances justifying handcuffing here appear more easily justified than in *Grice* or *Fiseku*. In *Grice*, there were numerous officers investigating a single individual with no indicia whatsoever of any crime or infraction, while here the vehicle and its occupants wreaked of the smell of marijuana; were in a vehicle with illegally tinted windows; had no identification; had no explanation of where they were going or what they were doing; lied to the police about the presence of contraband; and had significant amounts of cash and contraband clearly divided for sales concealed in their underwear. Here we have evidence of actual offenses and crimes, while in *Fiseku* there was mere suspicion that criminal activity was afoot.

Under these circumstances, the court here should also likewise heed the direction of the Second Circuit citing *United States v Sharpe* 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) and not indulge in needless second guessing of Officer Petritz's determination on a dark cold night in the middle of winter to proceed cautiously by handcuffing and briefly detaining Mr. Smith. Assuming then no de facto arrest and no constitutional violation, it follows that there was no duty to intervene.

Pl. Reply at pp. 5-9.   Defendants also reiterate that, even assuming Petritz acted

unreasonably in handcuffing Plaintiff, they cannot be held liable for failing to intervene

since "none of the Brockport Officers were in position to have known that Plaintiff's

constitutional rights were [being] violated,"[22] and since there was no reasonable

---

[22] Def. Reply at p. 6.

opportunity for them to release Plaintiff sooner earlier in any event, given all that was going on at the time.  Lastly, Defendants argue that even if a constitutional violation occurred, they would be entitled to qualified immunity.

The Court has carefully considered the parties' submissions.

DISCUSSION

The issue before the Court is whether Petritz's investigative detention of Plaintiff, during which Plaintiff was handcuffed and placed in the rear of a patrol car, violated Plaintiff's Fourth Amendment rights, and, if so, whether Clawson, McCracken, and Wakefield can be held liable for failing to intervene and stop Petritz from violating those rights.  The Court finds that Defendants are entitled to summary judgment, even assuming that Petritz unreasonably detained Plaintiff initially, prior to the later development of probable cause.

As an initial matter the Court reiterates that it is law of the case that following the traffic stop, Petritz had a reasonable suspicion that criminal activity was afoot sufficient to justify detaining Plaintiff during the investigation and search of the Mercedes.  Moreover, Plaintiff does not seem to really challenge Petritz's decision to place him in a patrol car during the investigation, and, even if he did, it was clearly reasonable to place Plaintiff into a warm patrol car rather than forcing him to stand outside in the bitter cold.  On that point, the body camera footage indicates that before the vehicle occupants were placed into patrol cars, they repeatedly complained about how cold it was that night.

The issue therefore boils down to whether it was reasonable for Petritz to handcuff Plaintiff before placing him in the patrol car.  Defendants' reply brief argues that it was reasonable as a matter of law for Petritz to do so, and that, consequently, Defendants

cannot be liable for failing to intervene. However, on the present record the Court cannot find as a matter of law that Petritz was entitled to handcuff Plaintiff, at least not prior to the development of probable cause which resulted from the totality of circumstances that culminated in the finding of narcotics hidden in Nazier's underwear.

On this point, the Court notes preliminarily that Defendant's reply brief is not entirely accurate concerning the sequence of events that preceded the handcuffing. Specifically, the reply brief incorrectly suggests that when Petritz made the decision to handcuff Plaintiff, the officers had already discovered that Dyshieka and Nazier had narcotics hidden in their underwear, when, in fact, those discoveries occurred shortly *after* Plaintiff was already handcuffed and detained.

Instead, the following facts were evident at the time Petritz handcuffed Plaintiff: The traffic stop took place on a dark night on a relatively deserted stretch of road; the stopped Mercedes had been speeding; the occupants of the vehicle, who equaled the number of officers involved in the investigation, were observed moving around inside the vehicle after the stop, and the explanation given for such movement was suspicious and later shown to be untrue; the vehicle smelled strongly of freshly-burnt marijuana and partially-burned blunts were visible in the ashtray; despite the clear evidence of recent marijuana usage inside the relatively small sedan, the driver initially denied recently using marijuana and at least two of the occupants denied knowing anything about marijuana; the driver could not produce identification or a vehicle registration, and at least one other occupant also could not produce identification; the occupants, all of whom claimed to live in the City of Rochester, were not college students and provided no clear explanation for what they were doing in a relatively isolated section of Brockport at the entrance to the

University; and one occupant was carrying a large sum of cash ($6,300.00) that he implausibly claimed was earned from delivering newspapers. These facts reasonably indicated, and the officers so concluded, that the four men might be engaged in narcotics trafficking.

Nevertheless, under the law of this Circuit, the Court cannot find as a matter of law that it was reasonable for Petritz, prior to the discovery of the concealed narcotics, to handcuff Plaintiff under those circumstances, in which the occupants had already been removed from the vehicle and Plaintiff had already been frisked and found not to have a weapon. On this point, the relevant law is clear:

> There is no bright-line rule regarding the use of handcuffs during a *Terry* stop. Usually, under the circumstances, the use of handcuffs transforms a *Terry* stop into an arrest. *See, e.g., United States v. Bailey*, 743 F.3d 322, 340–41 (2d Cir. 2014). Sometimes, under the circumstances, the use of handcuffs does not transform a *Terry* stop into an arrest. *See, e.g., United States v. Fiseku*, 915 F.3d 863, 873–74 (2d Cir. 2018); *Grice v. McVeigh*, 873 F.3d 162, 168 (2d Cir. 2017).

*Petaway v. City of New Haven*, No. 3:19-CV-1717 (SRU), 2020 WL 1969396, at *2 (D. Conn. Apr. 24, 2020).

> To satisfy the Fourth Amendment's reasonableness requirement, "officers conducting stops on less than probable cause must employ 'the least intrusive means reasonably available' to effect their legitimate investigative purposes." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir.2004) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). The rule does not operate categorically to authorize or prohibit particular forms of restraint in conjunction with an investigatory stop. Rather, it demands a careful consideration of the circumstances in which challenged restraints were used. Courts conducting such an inquiry are, moreover, properly mindful of the Supreme Court's caution in *Sharpe* that,
>
> > [a] creative judge engaged in post hoc evaluation of police conduct

can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

470 U.S. at 686–87, 105 S.Ct. 1568 (internal quotation marks, alterations, and citation omitted).

With these principles in mind, courts have upheld a range of restraints incident to a *Terry* stop, from the patdown at issue in *Terry* itself, to the drawing of firearms, to the use of handcuffs, all depending on the circumstances presented. *See United States v. Newton*, 369 F.3d at 674 (collecting cases). In sum, even though handcuffs are generally recognized as a "hallmark of a formal arrest," *id*. at 676 (collecting cases), not every use of handcuffs automatically renders a stop an arrest requiring probable cause to satisfy Fourth Amendment reasonableness, *see id*. at 675. The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat. *See id*. at 674.

*United States v. Bailey*, 743 F.3d 322, 339–40 (2d Cir. 2014) (emphasis added).

In *Bailey*, the Second Circuit held that it was unreasonable for officers to handcuff a suspect during a *Terry* investigation into criminal activity involving narcotics and a firearm, where the suspects had already been removed from their vehicle and frisked for weapons:

The relevant inquiry is whether police have a reasonable basis to think that the person detained poses a present physical threat and that handcuffing is the least intrusive means to protect against that threat. . . . We found these twin conditions satisfied in *Newton*, a case in which a defendant was handcuffed inside his home for the few minutes it took officers to search for and locate a firearm. The officers were in the home in response to a report that Newton illegally possessed a firearm and had recently threatened to kill his mother and her husband. In such a volatile situation, we concluded that it was objectively reasonable for officers to handcuff Newton until they had

25

located and secured the gun. Indeed, we concluded that handcuffing was a less intimidating—and less dangerous—means of ensuring the safety of everyone on the premises than holding Newton at gunpoint during the search.

<u>Here, the police faced no comparable physical threat when they handcuffed Bailey. To the contrary, having already subjected both Bailey and Middleton to a patdown, the officers had confirmed that neither man was armed. Further, having had both men exit the stopped vehicle, the officers had eliminated the risk that the men might obtain any weapon from therein.</u>  We recognize that police were investigating drug trafficking and unlawful firearm possession, crimes frequently associated with violence. But just as the law does not categorically assume that handcuffing transforms every stop into an arrest, so the law does not categorically assume that every investigatory stop related to particular crimes requires handcuffing, <u>particularly when a patdown outside a vehicle reveals the detainee to be unarmed</u>.

*United States v. Bailey*, 743 F.3d at 340 (emphasis added; citations and internal quotation marks omitted).

As Defendants correctly point out, subsequent to the *Bailey* decision, the Second Circuit upheld the reasonableness of a handcuffing during a *Terry* investigatory stop in both *Grice v. McVeigh*, 873 F.3d 162 (2d Cir. 2017) and *U.S. v. Fiseku*, 915 F.3d 863 (2d Cir. 2018).  However, those cases are distinguishable on their facts.  The *Grice* decision, in particular, involved very unusual facts that are completely unlike those of the instant case.[23]

The facts of *Fiseku* are more analogous, but still not entirely on point.  In particular, *Fiseku* involved a late-night encounter in a dark parking area between police officers and

---

[23] *See, e.g, Grice*, 873 F.3d at 162 ("These circumstances can easily be classified as unusual. McVeigh was on the lookout for railroad sabotage, received a report by police radio of an individual matching Grice's description bending down by the tracks with a remote control device, and was unaware of a pastime that could explain the behavior that was observed. He therefore had reason to believe, suspect, and fear that Grice might use an electronic device to set off an explosive on the tracks. It was not unreasonable for a lone officer to handcuff Grice in order to ensure that Grice could not press a detonator button on any electronic device until the tracks could be searched.").

three persons suspected of being involved with a burglary.  When the first defendant police officer arrived, he saw that some individuals were inside a parked vehicle, while one, and possibly more, were outside the vehicle.  The officer handcuffed the plaintiff, who was outside the vehicle, and another suspect, who had been inside the vehicle, even after frisking them and finding no weapons, at a time when one possibly-armed suspect still remained inside the vehicle, and other suspects may have been lurking nearby.  In finding that the officer acted reasonably in using handcuffs during a *Terry* stop, the Second Circuit stated:

> [Officer] Gruppuso radioed for assistance, but given the late hour and the remote location, he could not be sure how many units would respond, or how long it would take them to arrive. In fact, two units responded within minutes, but by that time, Gruppuso had already begun interacting with Fiseku. A pat-down did not reveal any weapons or contraband on Fiseku's person, but the Supreme Court has "expressly recognized" that "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Michigan v. Long*, 463 U.S. 1032, 1048, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (emphasis added). The *Long* Court explained further that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Id*. at 1047, 103 S.Ct. 3469. When Jajaga and Fiseku were restrained in handcuffs, an additional suspect (Hughes) remained seated in the Pathfinder, where weapons may have lain within reach. Moreover, in the dark, tree-lined parking lot, Gruppuso could not feasibly conduct a protective perimeter sweep to check for secreted weapons or additional associates while monitoring three suspects, whom the District Court described as "muscular men." App'x 185.

*Fiseku*, 915 F.3d at 871.

The facts of the instant case are clearly different.  For instance, when Petritz handcuffed Plaintiff, the four officers involved in the investigation had no reason to doubt that there were only four suspects, none of whom were particularly imposing physically, who had already been moved away from the vehicle and frisked for weapons.

The fact that the officers may have reasonably suspected the occupants of the Mercedes of committing the dangerous crime of narcotics trafficking does not mean it was reasonable for Petritz to handcuff Plaintiff during a *Terry* stop, in the absence of some reasonably-perceived ongoing threat from Plaintiff to the officers' safety.[24]   It is undisputed that at the time Petritz handcuffed Plaintiff, all four men had already been removed from the Mercedes, and Petritz's frisk of Plaintiff had been negative for weapons. Moreover, Plaintiff was being cooperative with the investigation, and there is no indication that he posed a threat to the officers' safety at the time Petritz handcuffed him. Consequently, the Court rejects Defendants' argument that it should find, as a matter of law, pursuant to the *Grice* and *Fiseku* decisions, that Petritz acted reasonably in handcuffing Plaintiff. *See United States v. Compton*, No. 13-CR-405, 2014 WL 12674478, at *6 (N.D.N.Y. Sept. 9, 2014 (holding that handcuffing constituted an arrest even when officers suspected the defendant was involved in drug activity, because defendant did not pose a present threat when he cooperated with officers' instructions, was not a flight risk, and there was no indication he was armed), *aff'd*, 830 F.3d 55 (2d Cir. 2016).  Rather, there are triable issues of fact on that point.

Nevertheless, the Court agrees with Defendants' argument that they are entitled to summary judgment on the failure-to-intervene claim, *even assuming* that Petritz acted

---

[24] *See, e.g., Rivera v. Trinh*, No. 3:19-CV-01257 (MPS), 2021 WL 3742240, at *4 (D. Conn. Aug. 24, 2021) ("Officer Trinh has not identified any ongoing concern that Mr. Rivera could access a weapon or otherwise posed a risk to the officers or others during much of the period that he was detained [in handcuffs].  While Mr. Rivera stated that there were other guns in the home, he told Officer Trinh that they were locked in the attic, and the record contains no suggestion that Officer Trinh was concerned, or had a reasonable basis to believe, that there were other firearms that might be immediately accessible to Mr. Rivera. Further, according to Mr. Rivera's version of the facts, he did not demonstrate unwillingness to cooperate with Officer Trinh's investigation.  Even Officer Trinh concedes that after some alleged initial resistance to being handcuffed, Mr. Rivera complied.  Thus, viewing the facts in the light most favorable to Mr. Rivera, I conclude that a reasonable juror could find that Mr. Rivera's detention ripened into a de facto arrest.") (citations and internal quotation marks omitted).

unreasonably by handcuffing Plaintiff.  As a preliminary matter, the Court finds no merit

to Plaintiff's contention that Defendants should be deemed to have been "personally

involved" in the handcuffing, without regard to any failure-to-intervene, simply because

Petritz placed Plaintiff into a vehicle owned by the Village of Brockport.

Rather, to the extent Defendants are liable at all, it is only under a theory that they

failed to intervene.  The elements of a failure-to-intervene claim are well settled:

> It is widely recognized that all law enforcement officials have an affirmative
> duty to intervene to protect the constitutional rights of citizens from
> infringement by other law enforcement officers in their presence. An officer
> who fails to intercede is liable for the preventable harm caused by the
> actions of the other officers where that officer observes or has reason to
> know: (1) that excessive force is being used; (2) that a citizen has been
> unjustifiably arrested; or (3) that any constitutional violation has been
> committed by a law enforcement official. In order for liability to attach, there
> must have been a realistic opportunity to intervene to prevent the harm from
> occurring.   Whether an officer had sufficient time to intercede or was
> capable of preventing the harm being caused by another officer is an issue
> of fact for the jury unless, considering all the evidence, a reasonable jury
> could not possibly conclude otherwise.

*Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (emphasis added; citations omitted).

Applying these legal principles here, the Court agrees with Defendants that even

assuming *arguendo* that Petritz acted unreasonably by handcuffing Plaintiff, Defendants

cannot be liable for having failed to intervene.  In this regard, it is first of all clear, from the

body camera footage, that defendants McCracken and Wakefield had no reason to know,

at the time it occurred, that Petritz had handcuffed Plaintiff.  More specifically, when Petritz

was frisking Plaintiff, and when he subsequently placed Plaintiff in handcuffs, Wakefield

was approximately two car lengths away, in the dark, frisking Holland and then, later,

running a records check inside his patrol car, and McCracken, who is much smaller in

stature than the other officers, was on the opposite side of the patrol car, in the dark, frisking Nazier.  These facts, taken from the Court's review of the body camera footage, are consistent with the supporting affidavits submitted by Wakefield and McCracken indicating that they did not observe Petritz's search and detention of Plaintiff because they were busy performing other investigative functions.

Indeed, the body camera footage further shows that long after Petritz had handcuffed Plaintiff and placed him in a patrol car, McCracken assumed that Plaintiff, like Holland, was *not* handcuffed inside the patrol car.  Specifically, at 24:33 on Clawson's body camera footage, near the end of the entire encounter, as McCracken and Clawson were in the process of searching Dyshieka a second time, McCracken stated to Petritz, referring to Plaintiff, "He's not cuffed in there, is he?"  To which Petritz responded, "Yeah, he's cuffed."[25]  This appears to be the earliest that McCracken could have known that Plaintiff was handcuffed, by which time the officers had developed probable cause as to Plaintiff, as discussed in the Court's prior Decision and Order.[26]  Similarly, the earliest that Wakefield could have known that Plaintiff was handcuffed was even later, when Plaintiff was removed from the patrol car to be searched a second time.

Moreover, even if Wakefield and/or McCracken had somehow managed to see that Petritz had handcuffed Plaintiff, they would have had no reason to know that he had done so despite finding no drugs or weapons on Plaintiff.  That is, they had no reason to know what Petritz's frisk of Plaintiff had uncovered, and, consequently, they could have reasonably assumed that Petritz was arresting Plaintiff after finding narcotics or other

---

[25] *See also*, McCracken body camera footage at approximate 15 minute mark (same).
[26] In any event, by this point the officers had probable cause to search Plaintiff for narcotics, as the Court found in its prior decision.

contraband during the frisk.   Furthermore, Plaintiff never complained to Wakefield or McCracken (or to any officer, for that matter) that he believed he was being improperly detained.

In sum, regarding Wakefield and McCracken, Plaintiff has not come forward with evidentiary proof in admissible form tending to show that either Wakefield or McCracken had reason to know that Petritz was violating Plaintiff's rights and failed to intervene despite having a reasonable opportunity to do so.

The question is closer with regard to Clawson, since, as "cover officer" when Plaintiff and Nazier were being searched, Clawson was located in a position to have potentially observed Petritz frisk and handcuff Plaintiff.   And, indeed, Clawson testified at deposition that while acting as "cover officer" he observed Petritz frisk Plaintiff and remove items from Plaintiff's pockets.   However, Clawson also testified that he did not observe Petritz's entire search of Plaintiff,[27] and this testimony is supported by the body cam footage which shows that initially, prior to when Clawson began assisting McCracken with the search of Nazier, Clawson was alternating his attention between the searches of Plaintiff and Nazier that were proceeding simultaneously.   On this point, at deposition Clawson testified as follows:

Q. The currency was taken off of whom?

A. I don't know whom it was specifically taken off of, sir.   That was when officers were doing their searches of the persons pockets.

Q. Was it taken off of my client [Plaintiff]?

A. I did not see.   I was going from your client back to another client going back and forth observing watching both personnel as their cover officer.   So

---

[27] Pl. Dep. At p. 39 ("I didn't witness his full search, sir.").

I cannot tell you exactly what was taken out of any person's pocket.

Pl. Dep. at p. 59.  Clawson further indicated at deposition that he was not aware at the time of the incident whether Petritz had found any contraband on Plaintiff, but that he had assumed that Petritz had not found any weapon, since he assumed that, for safety reasons, Petritz would have told the other officers about any weapons that he found.[28]

Additionally, in support of the instant motion, Clawson has submitted an affidavit in which he indicates that, prior to the second search of Plaintiff, he had been unaware that Petritz had handcuffed Plaintiff, since he had been busy searching the other vehicle occupants:

> A review of the bodycam footage demonstrates that I did not have an opportunity to intervene when Plaintiff was placed in the back of the police vehicle by SUNY Officer Petritz, as I was otherwise engaged in the search of the front seat passenger, identified as Nazier McFadden. . . .  While I was busy searching this individual, the [body cam] footage shows Officer Petritz off to my right, apparently patting down the plaintiff, Mr. Smith.  In fact, the audio indicates that while I was searching one of the other individuals, I indicated to Officer Petritz that he could place Mr. Smith in my patrol car, as the investigation continued.  My understanding at that point was that Mr. Smith was being detained for investigation.  My attention, however, was focused on the individual I was dealing with, Mr. [Nazier] McFadden.  While I assumed Plaintiff was being detained, as my focus was on the suspect who being searched and eventually arrested, I would not have known whether the Plaintiff was handcuffed or not, or whether as a result of Officer Petritz's initial pat-down whether he might be subject to arrest.  When Petritz was conducting his inquiry of Mr. Smith [(Plaintiff)], the [body-cam] footage show that I was fully engaged with [Nazier] McFadden and then the other passenger in the vehicle, as well as the driver of the vehicle, Dyshieka McFadden, upon whom crack cocaine was located.
> ***
> At that point, I frankly did not know what Officer Petritz's intentions were as to Mr. Smith, but my assumption was he was being detained for further investigation and placed in the patrol car for safety purposes.  At this point,

---

[28] Pl. Dep. At pp. 39-40.

we did not know who we were dealing with, but what we did know was that they were likely high on marijuana, they possessed marijuana, cocaine, thousands of dollars in cash, and the marijuana was held in the form that it looked like it was for sales.  The individuals were not from Brockport, only one person had any ID, the driver didn't have a license or ID and they had no real explanation as to where they were going or what they were doing. They also had not been truthful with responses to some of our questions. Accordingly, officer safety was of concern[.]

My [body cam] footage does show off to my right while I'm engaged with the front seat passenger [Nazier], that Officer Petritz had his handcuffs in his hands, presumably to handcuff the Plaintiff.  However, you can see and hear from the [body-cam] footage that I am fully engaged with the individual from the front passenger.  <u>While I must have known plaintiff was going to be placed in my vehicle as Officer Petritz asked where he could be placed, I actually did not know whether Plaintiff was or was not handcuffed.  I do not recall  observing Officer Petritz's pat-down or handcuffing of Mr. Smith and was not involved in the placement of the Plaintiff in the patrol car.</u>  I know now and likely knew then that no weapons were found in the pat-down of Plaintiff as I expect we all would have been made aware of such a finding.

At the time, I had no reason to believe that anything was amiss concerning the placement of Plaintiff in my police vehicle while we continued our investigation.  Additionally, a review of the bodycam footage from the beginning to the point when the Plaintiff was removed from the police car for the search that I conducted, it is clear I would not have had any opportunity to intervene as I was engaged the entire time in the investigation and/or search of the other occupants in the vehicle that had been stopped by Officer Petritz.

Clawson Affidavit, ECF No. 29-4 (emphasis added).

In opposition to Defendants' motion, Plaintiff contends that there are triable issues of as to whether Clawson had notice of Petritz's alleged improper handcuffing Plaintiff, since Clawson was located in a position in which it was possible for him to have seen Petritz search and handcuff Plaintiff.  Plaintiff also contends that there are triable issues of fact as to whether Clawson had a reasonable opportunity to intervene.

However, even assuming *arguendo* that Plaintiff has raised a triable issue of fact as to whether Clawson had reason to know that Petritz had handcuffed Plaintiff,[29] that is not the same as raising a triable issue of fact as to whether Clawson had reason to know that Petritz was violating Plaintiff's constitutional rights by doing so.  Clawson would not have had reason to know of the alleged constitutional violation, unless he also knew that Petritz had no basis to handcuff Plaintiff.    However, Clawson's sworn testimony is that he did not observe Petritz's entire search of Plaintiff, and that he therefore did not know "whether as a result of Officer Petritz's initial pat-down [Plaintiff] might be subject to arrest."

To the extent that Plaintiff here is claiming otherwise, and maintaining that Clawson had reason to know that Petritz's frisk of Plaintiff turned up no contraband or weapons, the assertion is unsupported by any evidentiary proof in admissible form.  Rather, as previously mentioned, Clawson's body camera footage shows that during Petritz's search of Plaintiff, Clawson was standing several feet away, alternately shining his flashlight between that search and McCracken's simultaneous search of Nazier, while Petritz was removing various items from Plaintiff's pockets without commenting on what he had found.  Consequently, it cannot be reasonably inferred that Clawson was aware of what Petritiz had found during his search.  Moreover, even if Clawson had observed the entire

---

[29] *But see, e.g., McCoy v. TJX Companies, Inc*., No. 21-CV-4907 (VEC), 2023 WL 4624499, at *4 (S.D.N.Y. July 19, 2023) ("Plaintiff has failed to establish that Defendant had actual notice. There is no record evidence that anyone complained about the stools or the manner in which they were displayed. Although Plaintiff alleges that a security guard was nearby at the time of her fall, there is no evidence that the security guard actually observed that the stools were improperly displayed. The mere assertion that the security guard "was in a position to see the area where the stools in question were located," is insufficient to create a genuine issue of material fact regarding whether Defendant had actual notice of the hazardous condition.") (citations to record omitted).

search, which is not shown by the evidence, he would have seen Petritz remove the baggie containing marijuana residue from Plaintiff's pocket, and could have reasonably assumed that Petritz, in whose investigation Clawson was merely assisting, intended to charge Plaintiff.

On the other hand, it is true that at the completion of Petritz's search, Clawson could have overheard Petritz tell Plaintiff that he was "detaining" him, without mentioning the word "arrest," which under most circumstances involving an investigative *Terry* detention would have been inconsistent with Petritz's subsequent application of handcuffs.  However, inasmuch as Plaintiff has not shown that Clawson had reason to know the actual results of Petritz's frisk of Plaintiff, or to know whether Petritz intended to charge Plaintiff with some crime, the Court finds that Petritz's use of the word "detain" in this situation, as opposed to the word "arrest," was insufficient by itself to put Clawson on notice that Petritz was possibly violating Plaintiff's Fourth Amendment rights.

For these various reasons, the Court finds that Plaintiff has not raised a triable issue of fact as to whether Clawson had reason to think that Petritz was violating Plaintiff's Fourth Amendment rights by applying handcuffs.

Furthermore, even assuming *arguendo* that Plaintiff had raised a triable issue of fact on that point, the Court finds that Plaintiff has not raised a triable issue of fact as to whether Clawson had a reasonable opportunity to intervene before the *Terry* stop ended. In that regard, the *Terry* stop ended when the officers developed probable cause to arrest all four occupants of the Mercedes, based on the totality of circumstances that culminated in the discovery of the narcotics concealed in Nazier's underwear, which essentially occurred simultaneously with Petritz's placement of handcuffs on Plaintiff.    More

specifically, according to Clawson's body camera footage,[30] Petritz began to apply handcuffs to Plaintiff at approximately 7:07 minutes, and approximately 13 seconds later, at approximately 7:20 minutes, Nazier admitted to Clawson and McCracken that he had a supply of marijuana concealed on this body.  Thereafter, Clawson actively searched Nazier for the concealed marijuana until approximately 8:00 minutes into the video, when Petritz can be overheard asking whether he can place Plaintiff into a Brockport police vehicle.  Thereafter, at approximately 9:49 minutes into the video, Clawson locates the marijuana concealed in Nazier's underwear.   In other words, Clawson was actively engaged in searching Nazier from the moment that Petritz applied handcuffs until probable cause was developed moments later, and the Court finds that no reasonable juror could conclude that Clawson acted unreasonably in that short span of time (less than three minutes) by failing to stop what he was doing and intervene in Plaintiff's detention.[31]

Alternatively, the Court finds that Clawson would be entitled to qualified immunity. On this point, the applicable legal principles are clear:

> "The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known. When a defendant moves for summary judgment based on qualified immunity, courts consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (citations and internal

---

[30] Clawson File 1 on CD-ROM.
[31] *But see, Ferguson v. City of New York*, No. 17-CV-4090 (BMC), 2018 WL 3626427, at *7 (E.D.N.Y. July 30, 2018) ("Although the video evidence suggests this seizure was brief (four or so minutes long), a reasonable jury could conclude that four minutes was enough time for another officer to intervene by telling plaintiff he was free to leave and letting him leave.").

quotation marks omitted).

"Summary judgment on qualified immunity is appropriate when 'a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions.'" *Charland v. Nitti*, No. 1:11-CV-1191 MAD/RFT, 2014 WL 1312095, at *7 (N.D.N.Y. Mar. 31, 2014) (quoting *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001)).

*Cole v. Mesiti*, No. 19-CV-6012 CJS, 2022 WL 17324841, at *6 (W.D.N.Y. Nov. 29, 2022).

Here, Clawson would be entitled to qualified immunity, since even if he had a duty to intervene under the circumstances presented here, that duty was not clearly established, for reasons including that it is not evident that he had authority over Petritz, who was a member of a separate police agency responsible for policing SUNY Brockport, where the traffic stop took place. *See, e.g., Grice v. McVeigh*, 873 F.3d at 169 ("Grice argues that the defendants are liable for their failure to intervene with the MTA police officers to prevent Grice's continued handcuffing. McVeigh and Farina, as officers of the Town of Greenburgh, had no evident authority over officers of the MTA, who serve in a separate hierarchy in a separate jurisdiction with particular responsibility for security of the railroad. In any event, MTA officers did not seem to be mistreating Grice, and could reasonably decide to interview Grice at the MTA facility. If McVeigh and Farina had a duty to intervene in those circumstances, that duty was not clearly established, and the defendants therefore enjoy qualified immunity on that claim.") (citation omitted).

Moreover, even assuming that the duty was clearly established in a broad sense, the Court finds reasonable officers could disagree as to whether Clawson had a duty or an opportunity to intervene under the particular facts presented here. *See, Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) ("Even if the right at issue was clearly established

in certain respects, however, an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context.") (citations and internal quotation marks omitted).

## CONCLUSION

Defendants' motion for summary judgment (ECF No. 29) is granted as to all remaining claims.  The Clerk of the Court is directed to enter judgment for Defendants and to close this action.

SO ORDERED.

Dated:      Rochester, New York
            August 13, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge